IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - - - - x
In Re:                              :
                                    :
JANIS ANNETTE STEWART,              :
                                    :
        Debtor                      :  Case No. 00-00046
                                    :
           (Chapter 11)             :
                                    :
- - - - - - - - - - - - - - - - - - x
                                    :
JANIS ANNETTE STEWART               :
                                    :
        Plaintiff,                  :
                                    :
    vs.                             :  Adversary Proceeding:
                                    :  02-10020
CAPITAL CITY MORTGAGE CORPORATION,  :
                                    :
        Defendant.                  :
                                    :  Washington, D.C.
- - - - - - - - - - - - - - - - - - x  June 13, 2005
```

TRANSCRIPT OF HEARING TO ADDRESS REMAINING ISSUES
PURSUANT TO ORDER ENTERED NOVEMBER 10, 2004
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Plaintiff:          MARCIA K. DOCTER, ESQ.

For Defendant:          CHARLES ACKER, III, ESQ.

Proceedings recorded by the Court, transcript produced
By Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307,
Washington, D.C. 20005, 202-347-5395, www.pro-typists.com
B9410/bf

**P R O C E E D I N G S**

THE CLERK: All rise. All persons having business before the Honorable S. Martin Teel, Jr., of the United States Bankruptcy Court for the District of Columbia draw nigh and give your attention. This Honorable Court is now in session. Please be seated and come to order.

Case on this morning's calendar will be Case 02-10020, Janis Stewart versus Capital City Mortgage Corporation. Matter before the Court is a hearing to address the remaining issues pursuant to an order entered on 11/10/04.

If the parties would please come forward and state your names for appearance.

MS. DOCTER: Good morning, Your Honor. I'm Marcie Docter for the Plaintiff, Ms. Stewart, who is here with me today.

MR. ACKER: Good morning, Your Honor. Charles Acker for Capital City Corporation.

THE MAGISTRATE JUDGE: Ms. Docter? Whenever you're ready.

MS. DOCTER: Your Honor, since this is really an objection to a fee application perhaps we should have Mr. Acker go first?

THE COURT: If you're ready.

MR. ACKER: My position is, Your Honor, that I

1  would stand on the papers once we know what the evidence

2  is.  Seems to me the parties seeking the attorney's fees

3  should go forward.  I have no witnesses, Your Honor.

4          MS. DOCTER:  I have no witnesses either, Your

5  Honor.  I'm just planning to argue.

6          THE COURT:  All right.  Who wants to go first?

7  Mr. Acker?  You want to go first?

8          MR. ACKER:  Pardon me?  I prefer not to, Your

9  Honor.  I have nothing to proceed with, other than to

10  attack the fee statement as submitted.

11          THE COURT:  Ms. Docter, why don't you go first,

12  please.

13          MS. DOCTER:  Okay.  Good morning, Your Honor.

14  This case has been going on a long, long time.  We

15  petitioned the Court for an award of fees and costs through

16  the date of the trial of this case and for a few days after

17  that trial.  Our fee petition doesn't include today's

18  hearing, preparation for today's hearing or the attendance

19  or preparation for the status last time.

20          It doesn't include -- excuse me, Your Honor.

21          It probably doesn't include a whole lot of time

22  that we didn't keep records of.  It is a fee award sought

23  of some $32,000.00, which includes a couple of thousand

24  dollars of costs.  It is for the handling of a complaint

25  and a bankruptcy proceeding for a hearing which took three

1   days, something like 50-some-odd exhibits on our side, I

2   think -- I have them here, I don't remember how many there

3   were, but there were three or four volumes of them.  I

4   don't think that this is an excessive amount.

5           The objection, as I understand it -- the primary

6   objection -- is that we charged for reviewing deposition

7   testimony of some of the employees of the Defendant,

8   Capital City Mortgage Corporation, in preparation for a

9   hearing, and two of those witnesses were not called.  I

10  don't think, Your Honor, that that is a valid objection.

11          In preparing for this hearing, I felt it was

12  important to review all the prior testimony, or some of the

13  prior testimony, the prior testimony to which I had access,

14  in any event, which detailed the modus operandi of Capital

15  City Mortgage Corporation, a well-known predatory lender.

16  It was necessary, in my view, to present to the Court

17  evidence of how this fellow operated, how this company

18  operated.  And what was the background behind the

19  settlement agreement which I arrived at in August of 1996,

20  with counsel for Capital City Mortgage Corporation, a

21  Mr. Eric Sanny, and what that agreement really meant.

22          What that agreement was, in my view and I believe

23  in the Court's view, in view of the Court's opinion of last

24  fall, that this company did not adhere to its loan

25  documents and, in any event, used any excuse it could and

1    even no excuse, to pile charges upon charges upon its

2    unfortunate borrowers, adding the charges to principal and

3    adding interest on the charges, not even with proper notice

4    to the borrowers, so that the borrowers never, ever, ever

5    could pay off the debt.

6            I have, as this Court may recall, litigated

7    against Capital City Mortgage Corporation on a number of

8    occasions.  I was somewhat familiar with how it operated.

9    This is not your typical mortgage lender.  It is not your

10   typical -- what do they call them -- BCD lender.  This is

11   a predatory lender that tries to steal the equity -- and

12   usually succeeds -- from these low-income borrowers,

13   primarily in the District of Columbia.

14           In this context, when even the -- I was

15   forwarding payments that Ms. Stewart made to Capital City

16   that I still wasn't getting an accounting or a proper

17   application.  It was in this context that Eric Sanny and I

18   agreed to a settlement agreement.  Which essentially said,

19   you can't do this any more on this loan, Ms. Stewart is

20   entitled to an accounting of what she sends you, you are

21   not entitled to charge her any other stuff, anything that

22   you can think of, you've got to deal with this on a

23   civilized basis.  And that's what that agreement required.

24           When Mr. Sanny left, and I could not even get

25   Letitia Watson, his successor, to acknowledge that there

1 had been such agreement, things really took on some

2 urgency.  And I tried to negotiate with Ms. Watson on many,

3 many occasions.  I did not want to file this suit.  But I

4 did.  I had to, ultimately.  And ultimately, after we filed

5 the suit, it was acknowledged that the agreement was

6 binding, that there was such an agreement, that this was

7 supposed to be a regular loan, not some predatory loan, and

8 that many, many items had been overcharged.

9         Pre-petition -- we'd had to file this bankruptcy

10 to avoid a foreclosure of this debt -- pre-petition,

11 Ms. Watson on behalf of Capital City filed a proof of claim

12 in the amount of approximately 41, 42 thousand dollars.

13 Afterwards, during the adversary negotiations, she said

14 that $43,000.00 was due.  Subsequent to our hearing and the

15 Court's decision last fall and the new accounting, revised

16 accounting provided by Capital City, 27,000 was due, as of

17 last January, and this I think included some -- I don't

18 know what it included.  But it certainly was a significant

19 reduction over the 43,000 that I had been told Ms. Stewart

20 was obligated.

21         So I am suggesting that in view of the Court's

22 opinion, even in view of the dollars involved, we had a

23 successful result.  We were able to reduce the obligation

24 by perhaps 35 percent, maybe 40 percent.

25         We have some discretion, I believe, as attorneys

1   for the Plaintiff, to determine what we should do in

2   preparation for the trial.  I reviewed Mr. Kuhn's testimony

3   and I have today summaries of my review of his testimony if

4   anyone's interested in seeing it.  Because Mr. Kuhn was

5   listed as witness and I had in fact, I believe, informally

6   deposed Mr. Kuhn even in the context of -- I don't know

7   whether it was this proceeding or -- I think it was

8   actually this proceeding.

9           I had a read of testimony of Mr. Bowdy in another

10  proceeding, who used to be counsel for Capital City

11  Mortgage Corporation, because I thought he had something to

12  say which would help the Court understand the context in

13  which this settlement agreement was entered into.  And I

14  have a summary of my notes of his testimony here with me if

15  anyone wishes to see them, and Mr. Bowdy was, of course,

16  listed as a witness.

17          I also reviewed the testimony of two long-time

18  employees of Capital City Mortgage Corporation, Herbert

19  Kaufman, whom I knew from other litigation, and Jack Matis,

20  both of whom had been whatever, their financial officer or

21  bookkeeper or accountant or something like that, whatever

22  name they had, for many years, and who were well aware of

23  the practices, and had in fact testified about the nature

24  of some of these predatory practices in prior proceedings.

25          I didn't call Mr. Kaufman or Mr. Matis because

1  they had moved, Mr. Matis from the D.C. address and Mr.

2  Kaufman from the Silver Spring address which I had, and I

3  couldn't locate them even though I had talked to both of

4  them -- not in the last few years now, but within a few

5  years before I had brought this litigation.  I think they

6  had something to offer, but I couldn't locate them, and I

7  think my review of the deposition was certainly something

8  that I had the discretion to spend legal time on in view of

9  this three-day trial that was forthcoming.

10          I don't really think there is anything else in

11  the objection that I need to respond to.

12          There is one comment that Henry Docter's fees

13  were listed at 185, I think, in an earlier report to

14  Capital City, and now had gone up to 200.  They did go up

15  to 200, I don't know at what point, and I'm perfectly

16  willing to concede the few hundred dollars that Capital

17  City thinks is the difference here.

18          Let's see how much -- oh, it had been increased

19  to 215 an hour, and a no-charge item had been charged in

20  full.  I think we had discretion to -- the no-charge item

21  is an attendance by Henry Docter at a hearing with me and

22  in assistance with the organization of documents for which

23  he charged 2.10 hours.  I believe that we should charge for

24  that.  I agree that we can charge 185 instead of 215.  So I

25  think the whole thing here is maybe $200.00.  Which I will

9

1    concede.  Without having to go through the math.

2            You know, the fact that Mr. Kaufman and Mr. Matis

3    were employees before the events of 1996 -- well, actually,

4    Mr. Kaufman was there until November of '97, and Matis was

5    there before that, I believe, but they both knew what

6    Capital City was doing.  And Kaufman actually, I dealt with

7    in connection with Ms. Stewart's case, before he left.  I

8    think these objections are tenuous and I think they should

9    be overruled.

10           THE COURT:  But if you knew he wasn't going to be

11   a witness -- because he wasn't listed by Capital City,

12   correct?  Mr. Matis?

13           MS. DOCTER:  I did not know he wasn't going to be

14   a witness, because I was going to call him if I could find

15   him.

16           THE COURT:  Well, why review his deposition if

17   you hadn't been able to find him?

18           MS. DOCTER:  Well, I reviewed his deposition

19   before I tried to find him.  I had his addresses and phone

20   numbers.  I reviewed his deposition to determine what they

21   would say that would be helpful, and then I couldn't find

22   him.  This thing has been going on for years, Your Honor.

23           THE COURT:  That explains that question, thank

24   you.

25           MS. DOCTER:  Mr. Kaufman was very helpful to me

1    in another case, as an adverse witness.  And Mr. Kaufman

2    was handling the Stewart files, as Capital City

3    acknowledges in his objection, until November of '97.

4              THE COURT:  But their objection is that the

5    settlement agreement speaks for itself, and the settlement

6    agreement had taken care of the types of problems that

7    Mr. Kaufman or Mr. Matis could have testified to.

8              MS. DOCTER:  I think, Your Honor, that although

9    this is not a jury, that the context in which these things

10   happened is important.  And although the dry letter of the

11   agreement may or may not persuade the Court -- in this

12   case, to some extent it did, although we did have witnesses

13   -- the dry letters may not persuade the Court.  The context

14   in which those letters were written would certainly explain

15   to the Court what was going on.

16             When you look at this agreement, it looks like

17   any other lender agreement.  But that's not what it was.

18   It was an effort to end these predatory practices, and I

19   needed to give the Court a full picture.  And I don't

20   think, reasonably, that that is unreasonable.  And I don't

21   think that $30,000.00 is a huge sum -- plus costs; I think

22   that's what it is, it's 32,064.11 -- no, it's almost

23   $31,000.00 in legal fees -- is too much for a three-day

24   trial in an adversary proceeding that went on for a couple

25   of years, in a case where my files are voluminous.

1    Absolutely voluminous.

2              This is not a simple "This agreement says X and

3    you did Y."  The question is, what was the context of X.

4    What were we trying to avoid?  Why did you -- really, I

5    should have asked for punitive damages, and I did ask for

6    general relief, and I think maybe the Court could grant it.

7    Why can they deny the existence of an agreement, for one

8    thing, put me to all this trouble, put the client to all

9    this trouble -- hearings, complaint, adversary, three days

10    of hearing, a status hearing, now another hearing --

11    because they wouldn't acknowledge the validity of the

12    agreement.  Because they wouldn't acknowledge that they

13    could no longer, in this case, engage in the predatory

14    practices that they normally engage in.

15              We didn't specifically ask for punitive damages,

16    but we asked for other relief.  And I think the Court could

17    grant those.  Maybe not at this point; the trial's over.

18    But I don't think $31,000.00 is too much for a three-day

19    trial, and I don't think they have the right to nitpick as

20    to what I did with every 10 minutes of the time.  I keep

21    good records.  They're probably understating the amount of

22    time I put on this case.

23              This is the kind of case that just eats up time.

24    The files have to be reviewed and reviewed again, all for

25    nothing, because they shouldn't have done it.  They were

1    wrong. And I think that the result that we achieved for

2    this client, which is at least a recognition that some of

3    these practices are no good, or -- I hope the opinion is

4    published. And we did reduce her loan, by at least

5    35 percent, maybe 40 percent. From what they said was due,

6    $43,000.00.

7         So, Your Honor, I think this statement of fees

8    and costs is reasonable, probably understated, and except

9    for $200.00 which I conceded, should be approved.

10         MR. ACKER: If I may, Your Honor. I'd like to

11   start with a couple of things preliminarily, and I think we

12   should speak about just what exactly is the issue here.

13   The attorney's fee claim is based upon the agreement and

14   release of 1996, which provided for attorney's fees. That

15   said you'll get attorney's fees in enforcement of the

16   agreement, and that is what Ms. Stewart, through counsel,

17   sought as set forth in her pretrial.

18         There were other things that were sought and that

19   was a determination of the principal balance. The figure

20   that the Debtor sought was not the figure that the Court

21   found. The Debtor did not prevail on that.

22         The Debtor did not prevail on application of the

23   payments in accordance with an original amortization

24   schedule.

25         What the Debtor did prevail upon was cancellation

1    of charges inconsistent with the note.  Now, what that

2    means is that the claim was that Capital City was putting

3    charges on the account that should not have been put on the

4    account.  Fair enough.  But the issue is once it hits the

5    account, once you put the numbers, whatever those numbers

6    may be, on the account, are they appropriately handled for

7    purposes of accounting?  And the Court found that the

8    accounting was correct.

9             The Court found that every payment that

10   Ms. Stewart made was applied properly.  The Court found

11   that there were no missed payments -- in other words, in

12   the sense of Ms. Stewart did not -- I mean, let me rephrase

13   that.  It's not missed payments.  There were no missing

14   payments in the sense that Ms. Stewart made a payment that

15   she claims existed that Capital City did not credit.  That

16   did not occur.

17            The question was not the consistency of the

18   accounting, it was what got put in the accounting.  And

19   that's significant because on every accounting issue,

20   Debtor did not succeed.  Where the Debtor succeeded was

21   only on whether something should have been put on the

22   account to begin with.  And that leads to the question of

23   Mr. Matis and Mr. Kaufman.

24            Now, it's not quite correct to use a funny term

25   like "chief financial officer," or something like that.

1    It's quite clear from the depositions that Ms. Docter read

2    Mr. Matis and Mr. Kaufman were bookkeepers.  Period.

3    Bookkeepers.  And bookkeepers take what they're given and

4    put them in the account.  They don't have the discretion to

5    decide whether Ms. Stewart is going to be charged for, as

6    in this instance, a disputed roof repair.  That's not their

7    purview.

8            Therefore, to spend all of these hours deposing -

9    - or, excuse me -- reading the depositions of these

10   gentlemen and all these hours, even reading the deposition

11   of Mr. Kuhn, because Mr. Kuhn testified that he doesn't

12   make those decisions.  All he does is put the numbers down

13   that he's directed to put down, and apply the formula.

14           So these are issues that -- first of all,

15   Mr. Matis and Mr. Kaufman were irrelevant.  If they're

16   relevant at all they're relevant to an accounting issue.

17   And if they're relevant to the accounting issue, the Debtor

18   lost on the accounting issue.  So it would be inappropriate

19   to grant the Debtor attorney's fees for, let's see, I think

20   it was like 990 for Mr. Matis and -- 990 for Mr. Matis, 750

21   for Mr. Kaufman, and another 1100 for Mr. Kuhn, on an issue

22   that was, one, irrelevant, and two, they lost on.

23           Now, insofar as the other issues go, if I may,

24   it's already been noted that there were no-charge items

25   changed to charge items from the statement of April 25,

1   2003, until the final statement that was submitted to the

2   Court.   And I have the April 25, 2003 statement, marked as

3   an exhibit -- if Ms. Docter objects to my submission of

4   that I'll put her on the stand and ask her to identify.

5            MS. DOCTER:   I wouldn't mind looking at it.

6            THE COURT:   I couldn't hear you, Ms. Docter.

7            MS. DOCTER:   I wouldn't mind looking at it.

8            THE COURT:   Oh, you haven't seen it.

9            MS. DOCTER:   What are we talking about?

10           MR. ACKER:   Pardon me?

11           MS. DOCTER:   My exhibit?   Oh --

12           MR. ACKER:   Yeah.

13           MS. DOCTER:   No objection.

14           THE COURT:   All right.

15           MR. ACKER:   I would also turn to several items

16  there.   For example, the Court's order specifically allowed

17  amounts incurred, quote, "through the date of trial of this

18  proceeding."   Despite that, there were charges dated after

19  the trial of the proceeding that are included in here.   One

20  on 5/7/03 and one on 11/18/04.

21           Also included is an entry, "a telephone

22  conference with Nancy Smith regarding D.C. tax claim," on

23  6/19/2000, for $90.00.   Well, clearly that's not an issue

24  with Capital City Mortgage Corporation.   That's totally

25  separate.   In fact, in every other instance of

1    conversations with the District of Columbia regarding tax

2    claims it was indicated as "no-charge."  But for some

3    reason this one has a charge attached to it.

4          I would then turn to, as I had mentioned, items

5    that relate solely to accounting issues.  For example, a

6    conference with Ms. Watson and Mr. Kuhn on 5/18/2000,

7    $600.00; on August 28, 2000, "a conference regarding

8    accounting issues."  There is another one on February 3,

9    '03, "to compare with Trustee's records."  Well, that's an

10   interesting one, because the only records the Trustee would

11   have would be of what payments Ms. Stewart would have made

12   post-petition, and in any event they're an accounting

13   issue; why should we be charged on an accounting issue

14   post-petition?

15         There was another one, "Read and review all

16   Stewart files to gather all payments from January 1996

17   through present."  That was on 4/22/03.  There again,

18   "all payments."  The Court found that every payment that

19   Ms. Stewart claimed was credited.  And it's interesting

20   that despite the suggestion and the coloration that counsel

21   tries to put on this, it has to be remembered that every

22   single payment that Ms. Stewart made was credited to

23   principal and interest, not a single bit of it, as can be

24   seen in the ledgers and as the Court implicitly found when

25   you reviewed the ledgers, not a bit of it was put to any of

1    the disputed charges.

2          In other words, the disputed charges were set

3    over to the side, even before they were disputed, and the

4    payments that came in were credited simply to principal and

5    interest.  Despite that, setting aside the question of all

6    the disputed payments, Ms. Stewart was in default when she

7    filed bankruptcy, she was in default when the Court entered

8    its order.  She's always been in default.

9          Now, lastly -- excuse me.  I would note that the

10   -- first of all, I'd note that despite counsel suggested it

11   was a three-day trial, by her own billing statement it was

12   only a two-day trial.  My recollection was that it was a

13   two-day trial.  So three-day trial sounds better but in

14   fact I think it was a two-day trial, as evidenced by her

15   statement.

16         And I would also note that the Court has dealt

17   with the issue of reasonableness.  In other words, are the

18   amounts reasonable.  When we look at this, and we look at

19   the issues and we look at what was won and what was lost

20   and what the issues were, are the amounts charged,

21   particularly when there's only a $27,000.00 principal

22   balance on this, are the amounts reasonable.  It has to be

23   remembered that they lost on all the accounting issues.

24   The Court found that on all accounting issues the

25   accounting was correct.  There were no misapplied payments,

1    there were no lost payments, there was nothing of that

2    type.  They were not to receive application of payments in

3    accordance with an original amortization schedule that they

4    sought, and basically what they got was cancellation of

5    charges inconsistent with the note.  That was the

6    enforcement of the agreement.

7            The problem is, how do we look at a statement

8    that has these items and make an allocation of what relates

9    to the enforcement of the agreement and what relates to

10   accounting issues.  We have some items specifically

11   identified as accounting issues.  However, a good portion

12   of the trial time was spent on accounting issues, as

13   opposed to enforcement of the agreement issues.  And

14   there's no way to tell what portion of the trial time was

15   allocated to what.

16           Additionally, and I'll mention lastly, we have

17   charges here for reviewing their own bills.  In other

18   words, we're supposed to pay for their reviewing their own

19   bills on top of everything else.

20           Finally, I would note that despite the suggested

21   coloration, Capital City is not a predatory lender, has

22   never been found to be a predatory lender, and is not in

23   fact in the business, and has not been for a number of

24   years, of lending to residential owner-occupied properties.

25   I'll be candid with the Court in telling you this is the

 1   last loan on the books.  We're not a predatory lender,

 2   we've never been found to be a predatory lender, and the

 3   suggestion that all of this came about because Capital City

 4   wouldn't admit or wouldn't agree that we couldn't continue

 5   the same sort of things that we'd been doing and that's why

 6   we said there was never an agreement is not correct.  If we

 7   go back to the trial, if we go back to earlier discussions,

 8   what happened was Capital City couldn't find the agreement.

 9   That's why Capital City said there was no agreement.  We

10   couldn't find it.  And that triggered a lot of the problem.

11           But in any event, it seems to me that this

12   statement submitted to the Court has a number of

13   inconsistencies, has a number of items that simply are not

14   appropriate to be charged against Capital City for the work

15   that was done.

16           That's it.  Thank you, Your Honor.

17           MS. DOCTER:  Your Honor, I've listened carefully

18   but I don't understand the difference between accounting

19   issues and accounting issues.

20           In the exhibits that we submitted, there is

21   Exhibit Number 15, it's a loan ledger.  Capital City on

22   this particular loan cites all kinds of charges.  Sure,

23   when they revised their statement and did an Excel, they

24   put all these charges to the side.  But on their loan

25   ledger, that's where the charges were.  And if the Court

 1   will look at that, it will see all kinds of unauthorized

 2   charges after '96 on this agreement.  These are all

 3   accounting issues.  What she owed and what they said she

 4   owed is an accounting issue.  I had to determine what

 5   payments she had made in order to prepare for the trial, to

 6   see whether they were correct.  That's an accounting issue.

 7   The accounting issue of charging for whatever these crazy

 8   charges were, are accounting issues.  It's how much she

 9   owed.  And this ledger will indicate clearly, this exhibit,

10   that they were busy doing what they normally did.

11           I don't understand what I'm supposed to believe

12   is an accounting issue that isn't part of this trial.  The

13   Court did not say that their accounting was correct.  The

14   Court said that there were all kinds of charges on there

15   that they needed to take off.  And when they did take them

16   off, the bill went from 43,000 to 27,000.  That's an

17   accounting issue.  I'm not an accountant, but that's an

18   accounting issue.

19           They may have applied her payments, but they also

20   were charging extra things and adding them to interest.

21   The question is whether anything should have been in that

22   account in the first place, is what counsel says.  Yeah,

23   that's right.  But that's an accounting issue.  That's an

24   accounting issue.  That's what the trial was about.

25           Kuhn testified, he was a witness, I was entitled

1    to review whatever he had said in prior depositions, in

2    order to deal with him, just to deal with that little bit.

3    This business about bookkeepers not having any discretion -

4              THE COURT:  Who called him as a witness?

5              MS. DOCTER:  They did, and they identified him as

6    a witness, and I knew he was going to be a witness.  And if

7    they hadn't, I would have.

8              The concept that bookkeepers don't have any

9    discretion, I'm not calling them as an expert witness.

10   I'm calling them to tell me what they normally did.  And

11   that's what I did in another trial, where this so-called

12   non-predatory lender was assessed $250,000.00.  They

13   recently completed their FTC deal and they had to pay

14   $650,000.00.  If that's not a predatory lender, I don't

15   know what is.

16             I'd like to address the charges dated after the

17   trial.  It's true that the Court award asked for a

18   statement up to trial, but these were necessary.  They all

19   had to do with -- one was 5/7/03, $86.00, a telephone

20   conference about continuing a hearing, and in November of

21   '04 a telephone conference regarding Judge Teel's decision,

22   that's $43.00.  Reviewing the decision could have been an

23   additional amount.  Attending the status hearing could have

24   been an additional amount.  This hearing could be an

25   additional amount.

1      Certainly reviewing my bill is relevant.  I'm
2  allowed to charge for the preparation of the bill and I'm
3  allowed to charge for the reviewing of the bill, and
4  neither of those amounts is excessive.  They're pretty
5  reasonable.
6      To conclude.  I don't understand the thrust of
7  counsel's argument that we didn't succeed on the accounting
8  issues.  We succeeded on the amount that was due on the
9  debt.  We reduced it by at least 35 to 40 percent, at least
10  35 percent, possibly 40 percent.  We were successful.  I
11  don't think anything I did in preparation for trial was
12  excessive.
13      The Court has ruled that $300.00 an hour was a
14  reasonable amount for my services.  And I think if the
15  Court reviews the fee application -- which I can't lay my
16  hands on although I just had it -- yeah, they're reasonable
17  amounts.  And if this was a two-day hearing, it was a
18  two-day hearing.  Maybe it just seemed like a three-day
19  hearing.  But it certainly was a complicated hearing.  I
20  think I prepared for it adequately.  I think I'm entitled
21  to an attorney's award, a reasonable attorney's award.
22      And this nitpicking about we didn't succeed on
23  Issue A and we did succeed on Issue B, I don't even
24  understand the distinction.  We succeeded -- we correctly
25  complained that these records were inadequate, that

1    Ms. Stewart was being overcharged, and the Court agreed

2    with us.

3          THE COURT:  Are you satisfied with Ms. Docter's

4    $200.00 concession regarding Henry Docter's fees?

5          MR. ACKER:  I'm sorry, Your Honor?

6          THE COURT:  Are you satisfied with Ms. Docter's

7    $200.00 concession regarding Henry Docter's fees?

8          MR. ACKER:  Yes, Your Honor.

9          THE COURT:  All right.  I'll take a recess.

10          THE CLERK:  All rise.  This Court will stand in a

11    brief recess.

12          (Whereupon, a brief recess was taken.)

13          THE CLERK:  All rise.  This Court is again in

14    session.  Please be seated and come to order.

15          THE COURT:  This is a hearing to address the

16    final issue in this matter, which is the amount of

17    attorney's fees that the Plaintiff, Janis Stewart, may

18    recover against the Defendant, Capital City Mortgage

19    Corporation, for enforcing the parties' settlement

20    agreement.

21          The settlement agreement is Exhibit 6 to the

22    pretrial exhibits of the Plaintiff.  This one doesn't bear

23    Capital City Mortgage Corporation's president's signature,

24    but I think this is the agreement that was eventually

25    executed, and I'll rely upon it instead of trying to track

24

1   down the final executed document.  Oh, here it is,

2   Exhibit Number 16 has a copy attached that has Mr. Nash's,

3   the president of Capital City's signature, attached.

4           That settlement agreement and release recited

5   that Janis Stewart was indebted to Capital City and that

6   the note was presently past due and in default and that

7   there remained a balance due thereunder, and that, quote,

8   "the holder and maker have agreed to a modification of the

9   terms of the note as set forth in a copy of the note

10  attached hereto as Exhibit A, and a modification to the

11  deed of trust attached hereto as Exhibit B," unquote.

12          And then it goes on to say, after that

13  recitation, "Now, therefore, in consideration of the

14  forbearance and the undertakings contained herein, it is

15  mutually agreed as follows."  And paragraph 1 deals with a

16  release with respect to all claims arising prior to the

17  effective date of the agreement.  There's no contention

18  that Capital City attempted to enforce any claim that

19  existed as of the effective date of the agreement.

20          Paragraph 2 says, "Each of the parties to this

21  agreement and release covenants that it will never

22  institute or prosecute any claim, demand or cause of action

23  release pursuant to paragraph 4 against any other party to

24  this agreement and release or in any way aid in the

25  institution or prosecution of any such claim, demand or

1  cause of action."  The reference to paragraph 4 was

2  obviously intended to be paragraph 1.  Again, there's been

3  no attempt to enforce a claim that was released under

4  paragraph 1.

5          Paragraph 3 then says, "In the event that any

6  party breaches any of the covenants, undertakings or

7  warranties of this agreement and release any party that is

8  damaged by the breach will be entitled to damages from the

9  breaching party including the amount of any counsel fees

10  and other litigation expenses incurred in enforcing this

11  agreement and release," unquote.  That is the provision

12  upon which the Plaintiff attempts to recover attorney's

13  fees.

14          Paragraph 4 is an integration clause reciting

15  that, quote, "This agreement and release and the exhibits

16  hereto, contain the entire agreement of the parties with

17  regard to the matters set forth herein.  Each of the

18  parties to this agreement and release has participated in

19  the drafting of this agreement and accordingly there shall

20  be no presumption that any claimed ambiguity will be

21  construed against any party," unquote.  That does not

22  assist in the resolution of the question of attorney's

23  fees.

24          Paragraph 5 recites similar language dealing with

25  this being the entire agreement of the parties, and that

1    the Debtor had access to the advice of counsel prior to

2    executing the agreement.

3            Paragraph 6 says, quote, "This modification

4    supersedes all prior agreements.  Upon execution of this

5    agreement, holder will return to maker the prior deed in

6    lieu of foreclosure.  Title remains vested in maker,"

7    unquote.  There's no suggestion that there's been a

8    violation of this provision.

9            Paragraph 7 recites that, "The amortization

10   schedule for the hundred payments of $380.72 each is

11   attached hereto as Exhibit C," unquote.

12           And finally of significance is paragraph 8,

13   quote, "Maker agrees to pay for her own taxes and insurance

14   (with a mortgagee's clause in favor of holder) and to

15   provide proof of payment to holder within 15 days of

16   payment.  Maker has 30 days from execution of this

17   agreement to provide proof of insurance.  Failure to comply

18   with this paragraph constitutes a default under the note

19   and deed of trust.  In the event maker does not cure such a

20   default within 15 days' written notice thereof to maker and

21   her attorney, Marcia Docter, holder reserves all rights to

22   pay any outstanding taxes and fines or to obtain insurance

23   for the property, said advances to bear interest at the

24   note rate until repaid, all at holder's option," unquote.

25           The Defendant in this proceeding did not concede

1   the existence of the agreement until December of 2002.

2   I refer to the Court's decision signed November the 10th,

3   2004, at page 7, note 5.  And I also refer to page 4 of the

4   Court's decision, the bottom paragraph.  As I recall, even

5   at the trial Capital City had not yet recorded the fully

6   executed modified deed of trust with the Recorder of Deeds,

7   and the Court accordingly, at pages 8 to 9 of its decision,

8   directed that Capital City will be ordered to record the

9   fully executed modified deed of trust.

10          It seems to me that Capital City's failure to

11  record that modified deed of trust with the Recorder of

12  Deeds was a breach of the settlement agreement, because the

13  settlement agreement recited that the parties had reached a

14  modified deed of trust and the deed of trust had not been

15  recorded, to signify that the original deed of trust was no

16  longer in effect.

17          In addition, the time spent prior to December

18  of 2002 when Capital City declined to concede that the

19  settlement agreement existed, it seems to me ought to be

20  allowable as time spent enforcing the settlement agreement.

21  It is a mystery to me how this adversary proceeding could

22  have gone on for so long without Capital City first

23  obtaining a copy through discovery of the settlement

24  agreement from the Debtor, but it did not, and took the

25  position that it would not concede the existence of a

1  settlement agreement.

2           Prior to that time, there was time spent on an

3  objection to claim which involved questions regarding

4  insurance policies, regarding tax arrearage, two items that

5  are mentioned in paragraph 8 of the settlement agreement.

6  And it seems obvious to me that the existence or non-

7  existence of the settlement agreement and the terms that

8  resulted from the parties' settlement agreement under the

9  new note and the new deed of trust were highly pertinent to

10  how any of this litigation preceding the adversary

11  proceeding would be handled.

12           I don't think it's fair to the Debtor to have

13  entered into a settlement agreement and for Capital City

14  not to have acknowledged the existence of the agreement and

15  the modified terms of the deed of trust and the promissory

16  note.  Obviously, that puts the Debtor into the position of

17  having to litigate issues that it is uncertain what the

18  controlling documentation would be until the existence of

19  the settlement agreement was acknowledged by Capital City.

20           In the circumstances, I think it is fair to award

21  fees through November of 2002 and prior to December of

22  2002, when Capital City finally acknowledged the existence

23  of the settlement agreement.

24           After December of 2002, there was still the

25  necessity of asking for an order to record the modified

1  deed of trust, and that shouldn't have been necessary but

2  it could not have been a substantial part of the

3  preparation of this adversary proceeding.  If that was all

4  involved, it could have been resolved very quickly.

5          If you look at the Court's decision, it lays out

6  the issues that were presented for trial.  Not all of those

7  issues arose from a violation of the settlement agreement

8  and release.  The first issue addressed at Part Two of the

9  Court's decision, starting at page 7, was ordering Capital

10 City to record the modified deed of trust.  In connection

11 with that, the Court noted that Capital City had failed to

12 include the original or copies of the August 1996 note or

13 the contemporaneous settlement agreement and modification

14 to the deed of trust.

15         The Court further noted that even once, in

16 December 2002, it received those documents from Debtor's

17 counsel, quote, "In the four months between receiving the

18 agreement and the trial in this matter, Capital City did

19 not update its records to reflect key changes to loan

20 terms," unquote.  The Court noted that the loan ledger was

21 altered to reflect some though not all of the terms of the

22 1996 agreement, and it did not prepare a ledger to reflect

23 the loan with new terms starting in August 1996.  The Court

24 finally ordered that the modified deed of trust be filed

25 with the Recorder of Deeds, as implicitly called for by the

1    1996 settlement agreement.

2          The Court then turned to charges that were in

3    controversy, and the first of those was the repair of

4    property and condemnation of the property.  Capital City

5    takes the position that all of the charges that are at

6    issue are simply accounting issues and do not go to a

7    violation of the settlement agreement.

8          In its decision, the Court noted that the entry

9    on to the premises to make alleged repairs was not

10   authorized by the settlement agreement, the modified deed

11   of trust or the modified note.  However, I do not believe

12   that any entry onto the premises would be a violation of

13   the settlement agreement itself.  And so I agree with

14   Capital City that the fees spent litigating this issue of

15   repairs ought not be chargeable to Capital City.

16         The next item involved were homeowners insurance

17   costs.  The Court noted at page 17 of its decision that,

18   quote, "Capital City at no time gave [the required] written

19   notice of default to Stewart with respect to Stewart's

20   insurance," unquote.  That's paragraph 8 of the settlement

21   agreement that's being referred to when the Court discussed

22   required notice.  And as I noted previously, the settlement

23   agreement required that "in the event maker does not cure

24   a default in insurance within 15 days' written notice

25   thereof, Capital City could pay all outstanding taxes and

1    fines or obtain insurance for the property, said advances

2    to bear interest at the note rate until repaid, all at the

3    holder's option," unquote.

4              Capital City charged for defaults regarding

5    insurance and taxes, without having given 15-day notice as

6    required by the settlement agreement.  Accordingly, the

7    Court concluded that no default existed regarding either

8    insurance or taxes.

9              The Court concluded that with respect to taxes no

10   interest was chargeable at the note rate as would have been

11   the case had 15-day notice been given and no cure had been

12   made, but that interest was recoverable at the legal rate

13   provided by the D.C. Code.

14             The issue arises whether Capital City's attempt

15   to enforce a default for insurance and taxes when there had

16   not been a default because there had not been day 15-day

17   notice of opportunity to cure constitutes a violation of

18   the settlement agreement.  Specifically, Capital City was

19   charging interest on the taxes at the note rate.  The Court

20   held that was improper.

21             With respect to interest on the insurance, the

22   Court held that no interest was allowed to accrue.

23             I think this is a violation of the settlement

24   agreement to have made those charges when the settlement

25   agreement contemplated that there would be a charge for

1    interest at the note rate only after the 15-day notice of

2    cure opportunity had been given.

3         The next item the Court's decision addressed were

4    payments in arrears, late charges and interest.  The Court

5    concluded that Capital City's accounting was accurate with

6    respect to payments.  The Court addressed the question of

7    interest on interest, and concluded that there was no

8    provision under the modified note for interest to be

9    charged upon interest.

10        However, the Court concludes that these are

11   indeed accounting issues.  They're not specifically

12   addressed by the settlement agreement.  It is an issue with

13   respect to the interest on interest of Capital City

14   attempting to make a charge that was inconsistent with the

15   promissory note as modified.  An argument could be made

16   that the deed of trust and the promissory note as modified,

17   as are referred to in the settlement agreement, are part

18   and parcel of the settlement agreement, meaning that their

19   terms are deemed to be settlement agreement terms and that

20   if a party acts inconsistently with the promissory note's

21   terms that is a breach of the settlement agreement.  I

22   don't think that's an appropriate analysis.

23        I think the appropriate analysis is that the

24   parties agreed that there would be an executed note,

25   modified note, and an executed modified deed of trust, and

1  that these documents would then govern the parties' rights.

2  The settlement agreement dealt with, one, a release; two,

3  the parties agreeing that they would proceed under a deed

4  of trust and a promissory note that would then govern their

5  rights; and three, that there would be a 15-day notice

6  provision regarding defaults in insurance or taxes.

7          I don't think it's appropriate to read every

8  default under the note or the deed of trust as constituting

9  a default under the -- a breach of the settlement

10  agreement.  That's the position the Court took in deciding

11  whether the secured creditor was entitled to recover

12  attorney's fees.  The Court looked to the deed of trust and

13  ascertained that only after certain notice was -- or after

14  a declaration of default or an acceleration of the note,

15  I've forgotten which but it doesn't matter, only after such

16  an event occurred were attorney's fees to be awardable to

17  Capital City.

18          Obviously, if the Debtor missed a payment under

19  the promissory note, if the promissory note's terms were

20  deemed to be part of the settlement agreement, then every

21  failure to make a payment would be a default giving rise to

22  a right to attorney's fees.  I didn't follow that analysis.

23  I instead looked to the deed of trust as controlling when

24  attorney's fees were recoverable, and didn't treat every

25  missed payment by the Debtor as a default triggering a

1   right under paragraph 3 of the settlement agreement to

2   attorney's fees for breach of the settlement agreement.

3   So I think the same analysis applies to the Debtor.

4           So I don't think that the provision for any

5   accounting of interest on interest gives rise to a breach

6   of the settlement agreement entitling the Debtor to

7   attorney's fees for enforcement of the promissory note's

8   not having any provision for interest on interest.

9           The Court then addressed miscellaneous charges

10  that were not substantial in amount, insufficient funds

11  charges, courier charges, they didn't amount to that much

12  in monetary terms, probably under a thousand dollars all of

13  them, under $200.00 all of them.

14          Next the Court addressed legal fees.  The Court

15  concluded that evidence was lacking to show an entitlement

16  to most of the attorney's fees.  But this did not go to a

17  violation of the settlement agreement.  I did note that

18  interest on attorney's fees would not be allowed and that

19  the intent of the parties was to reform the predatory

20  nature of the loan.  I don't think that that establishes

21  that this was a breach of the settlement agreement, even

22  though the settlement agreement was intended to avoid what

23  the Debtor believed were predatory practices in the past.

24          That's essentially it, in terms of what the

25  litigation involved.  And as can be seen, the litigation

1   over the repairs, the litigation over payments, and the
2   litigation over miscellaneous fees and attorney's fees,
3   all of that did not involve violations of the settlement
4   agreement.  In contrast, the litigation over insurance
5   and over taxes did involve a violation of the settlement
6   agreement.  In addition, the order to record the modified
7   deed of trust involved a breach of the settlement
8   agreement.

9          The time entries that have been submitted by
10  Debtor's counsel do not identify specific time devoted to
11  insurance and taxes and to enforcing the deed of trust,
12  getting it recorded.  It is all lumped together as one
13  whole ball of wax.

14         There are additionally objections to the
15  reasonableness of the time spent in trial preparation.
16  Mr. Kuhn was a witness in the proceeding.  Ms. Docter, the
17  Debtor's counsel, reviewed his deposition in preparing for
18  trial.  Two other individuals had been bookkeepers at
19  Capital City.  She reviewed their testimony, as well.  She
20  intended to have them as witnesses at trial, but was unable
21  to locate them after having reviewed their prior testimony.

22         Debtor's counsel justifies this time as related
23  to enforcement of the settlement agreement because she felt
24  that the context of the settlement agreement was important,
25  namely, a past history of charges that were invalid and

1    that included charges upon charges that prevented a debtor

2    from ever catching up on their payments.

3            There's an objection to the fees of Henry Docter

4    that increased from 215 an hour from $185.00 an hour.  The

5    parties concede that there ought to be a $200.00 reduction

6    in the amount of those fees that appear on the billing

7    statement.

8            There's an objection to the billing for reviewing

9    fees on January the 31st, 2003, an entry of $60.00.  I

10   don't think that's unreasonable since that was an issue in

11   the proceeding.

12           And attorney's fees enforcing the agreement would

13   be recoverable.

14           There's an objection to the amount of time spent

15   after the trial.  I overrule those objections.  There ought

16   to be additional compensation for time spent after trial

17   that's pertinent to this issue of attorney's fees enforcing

18   the settlement agreement.

19           There's an objection to a $90.00 charge for a

20   June 19th, 2002, communication with Nancy Smith of the

21   District of Columbia regarding a tax claim.  At that time,

22   however, Capital City was contending that the Debtor had

23   not paid taxes.  I think this is appropriate, particularly

24   in light of paragraph 8 of the settlement agreement that

25   called for notice to the Debtor before enforcing a default

1   in paying taxes.

2           With respect to these three witnesses, Kuhn,

3   Matthis and Kaufman -- Matis, M-a-t-i-s, not Matthis --

4   this had to do with showing a past course of conduct that

5   led to the settlement agreement and that the settlement

6   agreement had attempted to address by way of a new deed of

7   trust that didn't have some of the obnoxious provisions the

8   prior deed of trust had in it, a new note that similarly

9   did not have the same obnoxious provisions.  And the

10  settlement agreement also had this provision for notice in

11  the event of a default in taxes or insurance.

12          I think the testimony was of marginal relevance.

13  It went to the issue of past conduct that was of some

14  marginal relevance in understanding the context of the

15  drafting of the settlement agreement and the modified deed

16  of trust and the modified note, but it went to both the

17  enforcement of the settlement agreement and the accounting

18  issues.

19          There's an objection that some of the items in

20  the time entries specifically do deal with ledger items,

21  accounting issues -- May 18th, 2000, conference with Watson

22  and Kuhn regarding ledger, 2 hours; August the 28th, 2000,

23  conference with Watson regarding accounting issues;

24  February the 3rd, 2000, compare with Trustee's records --

25  I think that has to do with what payments were made by the

1    Chapter 11 Trustee in the case. "April the 20th, 2003,

2    read and review file regarding payments made; April the

3    22nd, 2003, read and review all Stewart files to gather all

4    payments from January '96 through present," unquote.

5              I'll sustain that objection.

6              And the final objection, of course, is what I've

7    been working towards, which is the objection that there's

8    no breakdown of the time that was specifically spent on

9    enforcement of the agreement.

10             The objection is made that the Court would have

11   to pull a figure out of air.  The Court has had no

12   testimony from Debtor's counsel regarding what portion of

13   her time was spent on the issues the Court has identified

14   as relating to the enforcement of the settlement agreement

15   as opposed to those that it has concluded are not related

16   to enforcement of the settlement agreement.  And frankly,

17   the Court does not have a transcript, I don't believe, of

18   the trial, where the Court could go back and review how

19   much time was spent at trial on the various issues.

20             Because the Debtor did not put on evidence to

21   attempt to quantify the amount, the Court is left with

22   having to make a conservative estimate that is fair to

23   Capital City and which may actually underestimate the

24   amount of time that the Debtor's counsel actually spent on

25   matters that are pertinent to enforcement of the settlement

1    agreement.

2          I think a fair estimate is 10 percent of the time

3    spent preparing for trial and conducting the trial.  So

4    what should be done is the time starting with December 2002

5    through the full amount of fees sought to today's date,

6    they should be reduced by $200.00 with respect to Henry

7    Docter, they should be reduced by the amount of fees that

8    were specifically earmarked as dealing with accounting

9    issues.  And then once a net amount is calculated,

10   10 percent of that amount should be recoverable as

11   enforcement of the settlement agreement.  Plus the

12   attorney's fees that accrued prior to December of 2002.

13         So what we have is $9,330.00 to December 2002,

14   which means that after December 2002 the amount incurred

15   was $22,734.11.  And that has to be reduced by $200.00, and

16   the amounts that were specifically earmarked as dealing

17   with accounting issues -- the $200.00 plus the accounting

18   issues comes up to $1,737.50.  So you subtract that from

19   $22,734.11 and you come up with $20,996.61, and I'll allow

20   10 percent is $2,099.66.  Added to the 9,330, is 11,429.66.

21   That'll be the award of attorney's fees.

22         MS. DOCTER:  Your Honor, may I address the bench?

23         THE COURT:  Yes.

24         MS. DOCTER:  Thank you.  First of all, in the

25   calculation of 10 percent did Your Honor include only

1  10 percent of the costs?

2         THE COURT:  I did the 32,000 --

3         MS. DOCTER:  Well, so only 10 percent of the

4  costs are --

5         THE COURT:  Yes.

6         MS. DOCTER:  Okay.  Your Honor, respectfully,

7  would you turn to Exhibit 16, which you have?  You referred

8  to earlier.  And that, I believe, is the agreement?

9         THE COURT:  Yes.

10        MS. DOCTER:  Okay.  The agreement refers, in its

11  first introductory paragraphs, to Exhibits A and B, and

12  subsequently to Exhibit C, which is attached to the

13  agreement.  And on page 2 of the agreement, the first

14  paragraph -- I don't have it in front of me, somehow I --

15  it's in here somewhere -- it referred to the agreement

16  including the exhibits attached hereto.  And the exhibits

17  of course were, "A" was the note, "B" was the deed of

18  trust, and "C" was the amortization table.

19            I can't believe the Court is really suggesting

20  that the agreement is something separate from the note and

21  deed of trust, which is what it was all about.  It was not

22  about simply the few provisions that were contained and

23  spelled out in the agreement.  It was a modified note and

24  deed of trust, which were the crux of the agreement.  And I

25  don't understand how it can be reasonably concluded that

41

1   enforcing that is not subject to the attorney's fee

2   provision.

3           THE COURT:  Anything else, Mr. Acker?

4           MR. ACKER:  I have nothing else, Your Honor.

5           THE COURT:  All right.  In response to the

6   Debtor's counsel's comments, paragraph 3 recited that, "In

7   the event that any party breaches any of the covenants,

8   undertakings or warranties of this agreement and release,

9   any party that is damaged by the breach will be entitled to

10  damages from the breaching party, including the amount of

11  any counsel fees and other litigation expenses incurred in

12  enforcing this agreement and release," unquote.

13          Once the note was modified and the deed of trust

14  were recorded, it seems to me that the parties had complied

15  with their obligation under the settlement agreement

16  wherein they recite that, "The holder and maker have agreed

17  to a modification of the terms of the note and a

18  modification of the deed of trust," unquote.

19          To suggest that a failure to comply with the

20  provisions regarding defaults under the promissory note or

21  the deed of trust is a breach of the settlement agreement I

22  think is an overly broad interpretation of paragraph 3 of

23  the settlement agreement.  It seems to me that inevitably a

24  party is going to have some -- it is potentially possible

25  in a mortgagee/mortgagor relationship that there will be

1    failures to comply with the literal wording of the

2    promissory note or the deed of trust.  It may be due to

3    following past practices that were intended to be done away

4    with by the modified deed of trust and the modified

5    promissory note, but the fact remains that by agreeing to

6    the modified deed of trust and the modified promissory note

7    and entering into those documents, the parties have

8    complied with that aspect of the settlement agreement.

9    They are then restricted as to what rights they have under

10   those documents, but a failure to comply with the terms of

11   those documents does not itself constitute a breach of the

12   settlement agreement.

13        Paragraph 4 does recite that, quote, "This

14   agreement and release and the exhibits hereto contain the

15   entire agreement of the parties with regard to the matters

16   set forth herein," unquote.

17        MS. DOCTER:  Well, I think I understand what the

18   Court is saying, but it seems to me that the exhibits, the

19   note and the deed of trust, are part -- as the amortization

20   schedule -- are part and parcel of the agreement and

21   release and were intended to be such.  That was the whole

22   point of it.

23        THE COURT:  Well, as the Court recited in its

24   ruling earlier today, the Court did not treat a default

25   under the promissory note by the Debtor as constituting a

1    breach of the settlement agreement that would have given

2    rise to an entitlement to attorney's fees on the part of

3    Capital City.  And what is good for the goose is good for

4    the gander.  And that's how I interpret the settlement

5    agreement.

6              Without any quantification of how much time was

7    spent on the two items, three items that I identified as

8    relating to enforcement of the settlement agreement after

9    December of 2002, namely, the failure to record the deed of

10   trust, the insurance costs and the taxes, where there had

11   not been the required 15-day notice, it seems to me that

12   without any quantification, 10 percent is a fair estimate.

13   It probably understates it somewhat, but that's all the

14   Debtor is entitled to in the absence of better evidence.

15             Thank you, counsel.

16             MS. DOCTER:  Thank you, Your Honor.

17             THE CLERK:  All rise.  This Court will stand in

18   recess until 2:00 p.m.

19             (Whereupon, proceedings were concluded.)

20

21

22

23

UNITED STATES OF AMERICA )
                        )    Case No. 00-00046
DISTRICT OF COLUMBIA    )

     I, PAUL R. CUTLER, do hereby certify that a recording of the foregoing proceedings in the above matter was duplicated from an original recording by the Office of the Clerk, United States Bankruptcy Court for the District of Columbia, and that said duplicate recording of the proceedings was transcribed under my direction to typewritten form.

                          _____
                           PAUL R. CUTLER

     I do hereby certify that the foregoing transcript was typed by me and that said transcript is a true record of the recorded proceedings to the best of my ability.

                          _____
                           BONNIE FURLONG