The decision below is signed as a decision of the court.

Signed: November 10, 2004.



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

```
In re                        )
                             )
JANIS STEWART,               )    Case No. 00-00046
                             )    (Chapter 13)
            Debtor.          )
_____ )
                             )
JANIS STEWART,               )
                             )
            Plaintiff,       )
                             )
        v.                   )    Adversary Proceeding No.
                             )    02-10020
CAPITAL CITY MORTGAGE        )
CORP.,                       )
                             )
            Defendant.       )
```

## DECISION

This decision addresses the matters previously tried in this proceeding. Janis Stewart is the debtor in Case No. 00-00046, which is pending in this court. Before the court is the complaint filed by Stewart to commence this adversary

proceeding to address the claim of Capital City Mortgage
Corporation ("Capital City").  Stewart objects to the amount
of the claim filed by Capital City and seeks to enforce a
Modified Deed of Trust signed by both parties in August 1996.
Capital City submitted a proof of claim for $41,726.09 in the
main case, including arrears of **$4,914.02.**[1]

This court held a two-day trial on this matter on April
28 and 29, 2003.[2]  Having considered the evidence and
arguments presented at the trial held in this matter, the
pleadings and exhibits pertinent thereto and the record
herein, this court makes the following findings of fact and
conclusions of law.

---

[1]  See Case No. 00-00046 Docket Entry No. 43, filed July
14, 2000.  **In that case, the court fixed the portion of the
pre-petition arrears to be paid under Stewart's confirmed
chapter 13 plan as being at least $2,370.39.  The $2,543.63**
remainder was reserved for challenge by Stewart in this
adversary proceeding.  Capital City agreed that the remainder
of the total arrears claim, if any, would be due only "when
the final payment on the Note is due."

[2]  This court has jurisdiction pursuant to 28 U.S.C. §
1334 (district courts have original and exclusive jurisdiction
of all cases under Title 11), and 28 U.S.C. § 157(a) and DCt.
LBR 5011-1 (all cases under Title 11 and proceedings arising
under Title 11 or arising in or related to a case under Title
11 are deemed referred to the bankruptcy judge of this
district).  This proceeding constitutes a core proceeding
under 28 U.S.C. § 157 (b)(2)(A),(B),(K), and (O).

I

BACKGROUND

On January 10, 2000, Stewart filed the petition that commenced the pending case under Chapter 13 of the Bankruptcy Code.  Stewart had a previous Chapter 13 case before this court, Case Number 95-1259, filed October 26, 1995, with a discharge date of March 10, 1997.

On or about July 27, 1993, Stewart acquired an interest in the real property located at 3401 Brother's Place, S.E., Washington, D.C.  The original note, between Stewart and Capital City, was an interest-only note (at an annual rate of 20%) in the amount of $26,000.  The monthly payment for that note was $504.09.  During her first bankruptcy case, Stewart and Capital City reached an agreement to modify their respective rights, and in August of 1996, they executed a Settlement Agreement and  Release ("Settlement Agreement"). Pursuant to the terms of the Settlement Agreement they executed a new note ("Note"), and a Modification of the Deed of Trust ("Deed of Trust") based on the amount that Capital City asserted was outstanding on the original note, $37,500.

The Note (that is, the new note) had an interest rate of 9% with a monthly payment of $380.72 and a payment due date of the fifth of every month until maturity.  The Note also

3

provided that if Stewart was late with her payment, outside the 10-day built-in grace period, there was a one-time late fee of $19.04.  To protect Stewart's interests, her attorney, Marcia K. Docter, also added a provision to the Settlement Agreement that copies of all tax and insurance notices regarding the Note be sent to her office as well as to Stewart.  The Note also contained a provision that any notices given to the debtor under the Note would also be sent to Ms. Docter.

However, the August 1996 Deed of Trust was never recorded by Capital City, which denied that the new Note had force and effect until well into this adversary proceeding.[3]  Capital City's president at the time of the renegotiation of the Note was Thomas Nash.  In October 2001, Thomas Nash had an accident that left him in a coma until he died on April 6, 2002. Capital City claims that it did not have signed copies of the Settlement Agreement until December 2002, when it was provided by Stewart's counsel.  Capital City also maintained that it was entitled to attorneys' fees for in-house counsel each time

---

[3]  Capital City now acknowledges the 1996 Settlement Agreement, Note and Modification of the Deed of Trust, but did not do so at the outset of this adversary proceeding.  There remains a dispute about attorneys' fees charged as well as other issues regarding the administration of the loan under the new note.

there was a default by the debtor and that a default includes any time Stewart's monthly payment was late and necessitated a late charge.

**Stewart questions Capital City's application of post-petition payments, alleging application of those payments to the amounts due pre-petition and that Capital City has assessed fees in accordance with the previous note and deed, in contravention of the current Note and Deed of Trust.**

Stewart also contends that attorneys' fees by in-house counsel are inappropriate, that those fees are not contemplated by the papers executed August 1996, and that Capital City did not disclose that Stewart would be charged anytime that in-house counsel performed work on her Note. Even if such fees are allowable, Stewart contends that Capital City cannot charge market rates for in-house counsel. Rather, the charge must be the rate that is actually paid to the attorney. Stewart further contends that Capital City inappropriately applied payments to these fees instead of the monthly Note payments. Finally, Stewart asserts that she never agreed that the fees would be added to the principal, with interest accruing from that point on.

There is also the issue with respect to the pre-petition arrears owed by Stewart (see fn. 1, *supra*). Stewart claims

the amount owed in excess of $2,370.39 is about $1,500 while Capital City claims the amount is about $2,500.

There are also some issues regarding payments made by Capital City, including tax, insurance and repair payments. Capital City is attempting to charge for the repayment of these items with interest. Stewart contends these payments were made in contravention of the 1996 Settlement Agreement because she was not given an opportunity to cure the default and that these payments cannot be used as reasons to accelerate the Note, nor can they be added to the principal of the Note.[4] Capital City contends that Stewart has consistently been behind in paying her taxes and insurance and that the Note allows Capital City to pay these items to protect its collateral. Additionally, Capital City contends that Stewart's property has been condemned by the District of Columbia, and that Capital City is within its rights to repair

---

[4] Paragraph 8 of the Settlement Agreement and Release states that "Maker agrees to pay for her own taxes and insurance (with a mortgagee's clause in favor of Holder) and to provide proof payment to Holder within fifteen (15) days of payment. Maker has thirty (30) from execution of this Agreement to provide proof of insurance. Failure to comply with this paragraph constitutes a default under the Note and Deed of Trust. In the event Maker does not cure such a default, within fifteen (15) days written notice thereof, to Maker and her attorney, Marcia Docter, Holder reserves all rights to pay any outstanding taxes and fines or to obtain insurance for the property, said advances to bear interest at the note rate until repaid, all at Holder's option."

the property in order to safeguard the collateral and the
superiority of its lien.

## II

### ORDERING CAPITAL CITY TO RECORD MODIFIED DEED OF TRUST

The court first notes that the adjudication of this claim
has been made infinitely more difficult due to Capital City's
poor record keeping.  Its records did not include the original
or copies of the August 1996 Note or the contemporaneous
Settlement Agreement and Modification to the Deed of Trust.[5]
Additionally, the lender's books are almost incomprehensible.

Capital City began this litigation with the stance that
there was no modification of the note or deed.  Capital City
then argued that the new agreement did not change any terms.
However, Capital City's own records do not conform to their
original position that there was no new note or its
alternative position that there were no new terms under the
new note.

First, the loan ledger was clearly altered to reflect
some, though not all, of the terms of the 1996 Agreement.

---

[5]  The court also notes that in order to aid the
resolution of this dispute, the debtor's counsel could and
should have provided Capital City with a copy of the 1996
Agreement prior to December 2002.  However, in the four months
between receiving the Agreement and the trial in this matter
Capital City did not update its records to reflect key changes
to loan terms.

Namely, the loan ledger still reflects the original $26,000 as the amount financed in an interest-only loan with a loan maturity date of August 1, 2003. The terms that were changed were the amount of payment ($380.72), the late charge ($19.04), the interest rate (9.000%), and a Note due date of 1108 (which this court takes to mean August of 2011 in accord with the terms of the 1996 Note).  The loan amortization spreadsheet dated July 23, 1996 (Plaintiff's Ex. 5) clearly sets out the amount financed, the finance charge, the annual percentage rate (APR), the date issued and the amount of payments consistent with the new note.

However, Capital City did not prepare a different ledger to reflect the loan, with new terms, starting in August 1996. That would have been advisable and helpful to the court in determining the amount of the claim.  Capital City did prepare two spreadsheets (Defendant's Exs. 1 and 15) that traced the loan from August 1996 to December 2002.  Exhibit 1 is a pro forma spread sheet and Exhibit 15 is a spreadsheet that shows actual distributions.  However, these spreadsheets added categories of payments, interest and charges that were not in the original loan ledger so the court's ability to use these in making comparisons was limited.

Capital City will be ordered to record the fully executed

modified Deed of Trust with the Recorder of Deeds, as
implicitly called for by the 1996 Settlement Agreement.

III

THE BURDEN OF PROOF ON OBJECTIONS TO CLAIM

Under 11 U.S.C. § 502(a), a claim by a creditor that is
supported by a proof of claim filed in the bankruptcy
proceeding is allowed unless a party in interest objects.[6]  A
proof of claim is considered prima facie evidence of the
validity and amount of the claim. F.R. Bankr. P. 3001(f).
Once an objecting party rebuts the prima facie validity of a
proof of claim, the claimant bears the burden of persuasion to
prove the validity and amount of the claim by a preponderance
of the evidence.  See In re Allegheny Int'l, Inc., 954 F.2d
167 (3d Cir. 1992); In re Ousley, 92 B.R. 278 (Bankr. S.D.
Ohio 1988).

The burden of production shifts between the parties, but
the burden of persuasion is always on the claimant, who has
the ultimate burden of proof.  The burden of proof falls on

_____

[6]  Federal Rule of Bankruptcy Procedure 3007 allows for
objections to claims and provides that an objection to claim
becomes an adversary proceeding if the demand for relief
includes any item included in Rule 7001.  Stewart wants to
determine the extent of the lien claim by Capital City and
desires injunctive relieve in the form of an order to compel
Capital City to record the 1996 Note and Deed of Trust, and
thus an adversary proceeding was required. See F.R. Bank. P.
7001(2) and (7).

the creditor to prove its claim, once the party objecting to the claim has met the burden of going forward by overriding the prima facie effect given to the claims filed. See In re Fidelity Holding Co., Ltd., 837 F.2d 696 (5th Cir. 1988), In re Brickell Inv. Corp., 85 B.R. 164 (Bankr. S.D. Fla. 1988).

Stewart has clearly met the burden of overcoming the prima facie validity of Capital City's claim.  Stewart presented sufficient evidence to force Capital City to demonstrate that it is correct in its version of the terms of the loan and the repayment amount of the loan.  Thus, Capital City could no longer rely on the prima facie validity of its claim, and it bears the ultimate burden of persuasion on this record.

IV

SPECIFIC ITEMS IN CONTROVERSY

The court now turns to the specific items controverted by the debtor.

A.

REPAIR OF PROPERTY/CONDEMNATION ISSUE

Among the charges that Stewart challenges is one amounting to a total of $862.50, which Capital City maintains it expended in order to make repairs to remove an order of condemnation from Stewart's property.  The challenge to the

10

charge is two-fold.  Stewart states that the work was never authorized.  Equally important, Stewart maintains that work was never performed.

On December 27, 1996, a Notice to Show Cause was served upon  Stewart and Capital City by the District of Columbia Department of Consumer and Regulatory Affairs.  There being no response, the Department issued a Notice of Condemnation on January 6, 1997.[7] This notice gave Stewart 5 days (instead of the usual 6 months) to either change, repair or demolish and remove the building.  The attached order of condemnation repeated the same information.[8]  This order stated that Stewart had until January 11, 1997 to repair the property or demolish the building.

Capital City states that it took steps to fix the items listed on the Order of Condemnation, including holes in the

---

[7]  The court notes that the Notice to Show Cause was issued on December 24, 1996, and the Notice of Condemnation states that an owner has 10 days (exclusive of Sundays and legal holidays) to respond to such a Notice to Show Cause. The Notice of Condemnation stated that the date of the Notice to Show Cause was December 27, 1996.  Even under the earlier stated date of issuance, the earliest the Board should have acted on the Notice was after January 8, 1997.  However, the Board for Condemnation of Insanitary Buildings did not let the entire notice period run and acted on the Notice to Ms. Stewart's property on January 6, 1997.

[8]  The court further notes that the order of condemnation did not include a seal by a notary public as required.

11

roof and fixing downspouts/gutters, after Stewart's failure to
respond to the Notice of Condemnation. Capital City supports
this statement with copies of invoices dated January 20 and
27, 1997, that purport to show materials ordered for 3401
Brothers Place from Galliher and Huguely and lists a total of
$566.11.[9] Additionally, there are cancelled checks to James
Robinson and Tommy Farley in the amount of $266 and $30,
respectively. There is a copy of a handwritten ledger that
states that Robinson was paid for 28 hours of labor at 3401
Brothers Place at $9.50 per hour. The ledger reads "Hung New
Gutters-front back + side, Repaired Porch's floor + ceiling-
Installed new supports." There is no explanation of the $30
charged by Tommy Farley for 3401 Brothers Place.

Stewart's testimony, which the court credits, established
the following: Stewart never received the notice to show
cause, the notice of condemnation, the order of condemnation,
or notice from Capital City that it intended to make repairs
based on Stewart's having defaulted in keeping the property in
good repair. She did contact the city government to try to
ascertain whether there was any way for her to get assistance
in fixing a leaky roof, but she has never been able to find

_____

[9] The total amount for materials used at 3401 Brothers
Place should have been $556.66.

any organization that was able to help her.  Stewart never saw
anyone come to work on her home and knew of no work done on
her house in 1997.  She did not authorize repairs on the house
in 1997 and didn't receive any bills or invoices for work done
on her home in 1997.  Indeed, the gutters and roof remained in
bad shape in 1997 and thereafter, although Stewart concedes
that the roof's leaking was at some point not as bad as it had
been.

Capital City had the burden of proving to the court that
these charges should be allowed against Stewart.  The court
had no other evidence on the issue besides Stewart's
testimony, the copies of the D.C. Notices and Order, and the
copies of the invoices and cancelled checks provided by
Capital City.

Capital City also set forth the legal argument that it
had the right to fix the property to protect its collateral.
That is, in order to protect its rights as the senior (and
only) lienholder of the property, Capital City had to make
repairs to the property to avoid the District of Columbia
placing a tax lien on the property.  This argument does not
have a sound legal or factual basis.  The notice from the
District of Columbia does warn that if a property is not
repaired within the time period given, the Board of

Condemnation of Insanitary Building "will correct the insanitary condition by rendering the property sanitary or having it demolished and removed.  The cost of the BCIB's corrective action will be assessed as a tax against the property and collected as such."  D.C. Code Ann. (1981) § 5-707[10] addresses the failure of an owner to comply with an order of condemnation and states that if the District of Columbia orders the repair of an insanitary building, the cost of such repairs and the cost of publication shall be assessed as a tax against the premises on which the building was situated.  However, those taxes may be paid <u>without</u> interest within 60 days from the date the tax was levied.[11]  Thus, the danger of a tax lien was not imminent and Capital City could and should have contacted Stewart prior to taking action.

The condition of the premises in January 1997 may have

---

[10]    The current citation to statutory provision regarding insanitary building in the District of Columbia is D.C. Code Ann § 6-907.  D.C. Law 13-281 made minor changes to the statutory language but left the provisions pertinent here substantially unchanged, changing "insanitary condition"  to "unhabitable or insanitary condition."

[11]    If the tax has not been paid within 60 days, interest of one-half of one percentum for each month shall be charged on all unpaid amounts, which may be paid in 3 equal installments with interest.  If any tax remains unpaid for two years after the date the tax was levied, then the property may be sold as at a tax sale, under the same conditions as property sold for delinquent general real estate taxes.

constituted a default under the deed of trust, as a violation
of the covenant to "keep the said premises in as good order
and condition as **they are now** and will not commit or permit
any waste thereof, reasonable wear and tear accepted, and that
he will not act or fail to act in any manner which will
jeopardize the lien of the Deed of Trust" (Emphasis added).[12]
Stewart's failure to respond to the Board of Condemnation's
correspondence might also be considered "failing to act" in a
manner jeopardizing the deed of trust.

However, that is not a question this court must decide.
If Stewart failed to act as required by the Modified Deed of
Trust, then that would have constituted a default and Capital
City's recourse would have been to either accelerate the Note,
after proper notice to Stewart, as called for by the
Settlement Agreement, Note and Modified Deed of Trust, or work
out some agreement with the consent of Stewart for repairing
the premises.      Nothing in the Note, the Settlement
Agreement or the Deed of Trust allowed Capital City to enter
upon, inspect, and repair the premises without Stewart's

---

[12] Even that is arguable.  In the normal deterioration
process, it is unlikely that the conditions that existed in
December 1996 did not exist in some substantial form in August
1996 when the Modification of the Deed of Trust was executed.
Thus, the conditions "as they are now" might have been
condemnable in August 1996.

consent.  The unilateral, unauthorized, non-consensual entry onto Stewart's property and repair of the premises would constitute trespass by the agent(s) of Capital City.  Thus, the court will disallow the claim with respect to the costs of the repair of the premises and any interest that has accrued on that cost.

Lest Capital City try to make the argument of unjust enrichment or some other equitable argument that would reimpose the cost of the repair on Stewart, the court has considered and would reject those as well.  Stewart's testimony was the only evidence as to the state of the premises after the repairs were made.  Stewart stated that the roof still leaks (albeit a little less) and the gutters are still in poor condition.  The repairs were unsuccessful. Thus, the repairs made to Stewart's premises, were of negligible, if any, value and do not warrant an equitable recovery of costs.  Capital City offered no evidence to quantify such value.

### B.

### HOMEOWNER'S INSURANCE COSTS

The Settlement Agreement between Stewart and Capital City was explicit in the responsibilities of each party with respect to proof of insurance on the property at 3401 Brothers

Place.  Stewart (the "maker" of the Agreement) agreed to pay
her own insurance and provide proof of payment within fifteen
days of payment.  Stewart had 30 days from the execution of
the Settlement Agreement to provide proof of insurance to
Capital City ("the holder") and failure to comply would
constitute a default under the terms of the agreement.  If
Stewart fails to make an insurance payment as required,
Capital City has the right to pay outstanding payments or
obtain insurance for the property with repayment by Stewart to
accrue interest at the Note rate until repaid, but only after
giving Stewart and her attorney 15 days written notice of the
default.

Capital City at no time gave such written notice of
default to Stewart with respect to Stewart's insurance.  The
record contains a number of letters and insurance notices
regarding  insurance (but <u>no</u> notices under the Settlement
Agreements 15-day notice provision from Capital City to
Stewart) and the court will address each individually.

The first notice presented by Capital City is a notice
that is barely legible and poorly photocopied.  It is from
Allstate Insurance and addressed to Capital City.  It states
that if a minimum payment is not received by March 4, 1999,
the policy will be cancelled.  Capital City would like the

17

court to state that this is an instance of default because it is entitled "Homeowner's Policy Cancellation Notice [F]or Non-Payment of Premium."   However, it is clear from reading the notice that it constitutes the homeowner's last chance to ensure that the policy does not lapse.  Apparently, Stewart paid the insurance in time because Capital City submitted no letters, faxes or other correspondence regarding the March 4, 1999 notice, and did not show that it made the payment.

In September 1999, a homeowner's insurance bill – not a notice like the ones previously received, but a plain bill – was sent to Capital City.  The amount due for the bill was $627.17.  The bill was due on September 6, 1999.  Capital City paid the bill on September 1, 1999 by check and that check cleared on September 9, 1999.  Capital City's submission is absolutely devoid of any correspondence with Stewart or her counsel with respect to this bill.  Allstate refunded Capital City all of the monies in December 1999 because the bill was paid by Stewart.  Capital City argued that under the Settlement Agreement, it had the right to pay these amounts and charge Stewart interest in repayment of the insurance premium.  However, Capital City did not comply with the notice requirement of the Agreement.  Capital City said it did not comply because it wanted to protect its collateral and make

sure that the insurance did not lapse.  That does not ring true in light of the two other times when Capital City was notified by Allstate regarding the insurance (see above and below).  The notices clearly stated that insurance was about to lapse and gave the date and time of lapsing, but Capital City nevertheless did not make payment.  This, in contrast, was simply a bill and even more clearly did not warrant action on the part of Capital City in contravention of the Agreement.

Capital City makes the argument that Stewart never provided proof of insurance as required and was therefore in default 30 days after the execution date of the Agreement. However, Capital City was aware of the insurance status of the premises.  Capital City was receiving information from the insurance company directly as to the status of the insurance, receiving notices of pending cancellation of the policy as well as regular billing statements.  Whether Stewart, her counsel, or the insurance company caused the bills to be sent to Capital City is irrelevant: Capital City was receiving the information.  The purpose of the insurance clause in the Settlement Agreement was to ensure notice to Capital City regarding the status of homeowner's insurance, and notice was given.  Additionally, Capital City never gave Stewart an opportunity to cure the default as contemplated by the

19

Agreement.

In April 2000, Allstate sent another such notice to Capital City. The "received" stamp from Capital City cites April 27 as the date and the notice states that if the payment is not received by May 2, 2000, the policy will be cancelled. A letter dated May 10, 2000 and received May 12 by Capital City states that Allstate received Ms. Stewart's payment but that the policy had been cancelled on April 7, 2000. This was clearly a clerical error by Allstate, since the previous notice had been sent out after April 7 and it stated Stewart had until May 2 to pay her bill. The letter does not state whether the payment was received in time for the May 2 deadline but apparently Stewart maintained her insurance with Allstate after that time. Capital City did send a fax to Marcia Docter, Stewart's attorney, warning that Capital City might pay the insurance policy if Stewart did not or obtain other insurance that would be charged to Stewart. There was no mention of the 15-day notice period contemplated by the Settlement Agreement but Capital City appeared to be complying with the spirit of the agreement. On May 16, 2000 Capital City faxed Marcia Docter a copy of the insurance notice that mistakenly stated the insurance policy had been cancelled in April. However, there is no further correspondence and

Capital City made no attempt to pay the insurance bill.

Based on Capital City's lack of compliance with the notice requirement of the Settlement Agreement, no interest that accrued on the $672.17 that Capital City paid to Allstate will be allowed.  Capital City moved into evidence selected notices and bills received from Allstate.  It is presumed that Capital City was receiving these notices all along, especially since there was testimonial evidence that Mr. Thomas Nash was "persnickety" about the insurance being paid on properties that Capital City held mortgage notes for.   These notices are sufficient to comply with Stewart's notice obligations under the Settlement Agreement and the insurance matter is not an item that caused default under the Agreement or the Note.

C.

TAX PAYMENTS

Capital City and Stewart are in disagreement as to whether the property taxes were timely paid in accordance with the Agreement, Note, and Deed of Trust.  The record shows that the District of Columbia sent Stewart two tax bills per year, one in March (due without penalty by March 31) and the other in August or September.  Stewart and Capital City agree that in 1996, shortly after the time of the renegotiation of the mortgage, Capital City made two payments for real estate taxes

21

that totaled $494.64 ($242.73 and $251.91 respectively).  That payment was made by Capital City by agreement between the parties.  Capital City's records show that the payments were made on September 18, 1996.  Stewart has repaid that money plus an additional sum for interest.  From March 1997 to November 1997, she made repayments that totaled $559.96, an amount sufficient to include interest accrued.[13]

Capital City has paid other installments of Stewart's real estate taxes since that time:  the first time on May 6, 1997, paying $241.91 for the first half of 1997's tax bill; again on March 26, 1998, in the sum of $251.91 and $252.17 ($504.08) for the first half of 1998's tax bill and for 1997 delinquent taxes respectively; and again on September 19, 1999 in the sum of $977.82 for the first and second half of 1999's tax bill and 1998's delinquent tax bill.

Stewart has provided the court with copies of her tax bill for the years 2000, 2001, and 2002 and has proven that she paid her taxes for those years.  Thus, a total of $1,723.81 in tax payments were made by Capital City on behalf

---

[13]  Stewart has not submitted any calculations to show that the interest paid was excessive, and determining the correct interest amount is not worth the effort, given the small amount at stake.  At 9% simple interest per annum, a payment of $494.64 after one year would have required a payment of $539.16.

of Stewart.  The issue is what interest that $1,723.81 bears.

The Settlement Agreement expressly contemplated that any tax paid by Capital City would bear interest at the Note rate only if Stewart failed to pay the tax after receiving a 15-day notice of opportunity to cure the default in the tax payments. There is no limit to the number of cure opportunities Stewart is allowed in the Agreement.  Capital City did not provide the proper notice of default under the Settlement Agreement. Capital City's argument is that, similar to the repair of 3401 Brother's place, it had the right to make payments on taxes to protect its collateral from another, superior lien attaching to the property.  However, Capital City could have and should have notified Stewart of her default under the Settlement Agreement and given her the 15 days to cure the default as negotiated by both parties.

Nevertheless, Capital City could alternatively look to Paragraph 1 of the Deed of Trust which provided that:

> [Stewart] will pay . . . all taxes . . . relating to the land and premises . . . and in default of any such payment to the holder of any such payment [Capital City] may pay the same, and any . . . sums so paid shall be added to the debt hereby secured, <u>shall be payable on demand, shall bear full legal interest, and shall be secured by this Deed of Trust</u>. [Emphasis added].

The Settlement Agreement and Deed of Trust are not in

23

conflict.[14]

Under the Settlement Agreement, Capital City would only be entitled to interest at the Note rate if the 15-day default notice provision were invoked.  Capital City never invoked the 15-day notice mechanism.  Nevertheless, upon making a payment of taxes, Capital City can properly demand that Stewart pay the amount of the tax, but to Capital City in lieu of the District of Columbia.  That is the only reasonable interpretation of the Settlement Agreement and the Deed of Trust, as Stewart would otherwise enjoy a windfall. Paragraph 1 of the Deed of Trust provided that tax sums paid by Capital City "shall be **payable on demand**, shall bear full legal interest, and shall be secured by this Deed of Trust."(Emphasis added).  This provision brings into play D.C. Code Ann. §§ 15-108 and 28-3302(a).

Section 15-108 provides:

> In an action . . . to recover a liquidated debt on which interest is payable by contract . . . the judgment for the plaintiff shall include interest on the prejudgment

---

[14]  However, the Settlement Agreement altered terms of that Deed of Trust, and to the extent that any inconsistency exists must be resolved in favor of the Agreement over the Deed.  The Deed of Trust is a boiler plate agreement on a form from the Washington Law Reporter.  The Settlement Agreement was negotiated and drafted by the parties to ensure that the terms of the Agreement faithfully reflected the intent of both parties.  Specifically negotiated language supercedes boiler plate language when interpreting a contract between parties.

debt from the time when it was due and payable, at the
rate fixed by the contract, if any, until paid.

Section 28-330(a) provides:

The rate of interest in the District of Columbia upon the
loan or forbearance of money, goods, or things in action
in the absence of express contract, is 6% per annum.

Accordingly, Capital City is entitled to interest at 6% per

annum on the sums it paid to the District of Columbia for

unpaid taxes, from the date the sums advanced by Capital City

were due and payable. See Gen'l Ry. Signal Co. v. Washington

Metro Area Transit Authority, 875 F.2d 320, 328-329 (D.C. Cir.

1989), cert. denied, 494 U.S. 1056 (1990). The sums arguably

were originally only due and payable by Stewart from the date

of demand by Capital City for payment. At the earliest,

Capital City made demand for payment of those amounts when it

filed its proof of claim, February 1, 2000.

However, the Deed of Trust can be read as supporting an

earlier due date, that is, as providing that the sums paid by

Capital City immediately become part of the secured debt, and

from that moment are to bear interest at the full legal rate,

with the Capital City free to demand payment at any time. In

other words, for purposes of interest, the tax payments made

by Capital City are due and payable by Stewart immediately,

but Stewart cannot be held in default for not making payments

unless and until Capital City makes demand.

25

This is the more reasonable interpretation.  Although Stewart may have only belatedly had demand made on her for the tax payments made on her behalf, she was aware of missing tax payments and in a position (by way of inquiry to the government or to Capital City) to determine what sums were paid by Capital City.  She ought not obtain the windfall of an interest-free advance of sums to pay the taxes.  The Settlement Agreement does not bar this interpretation: it only precludes Capital City from declaring a default based on a missed tax payment, including any default in paying Capital City for tax amounts that Capital City paid.  The Settlement Agreement did not alter Capital City's right to pay taxes if Stewart defaulted in paying taxes to the District, and the Settlement Agreement did not alter Capital City's right under the Deed of Trust to be made whole, including receiving interest at the legal rate.  Thus, a total of $1,723.80 plus 6 percent interest from the date of each payment by Capital City will be the allowed amount of the claim.

D.

PAYMENTS IN ARREARS, LATE CHARGES, AND INTEREST

Stewart, through her counsel, admits to missing a number of loan payments in 1998 and 1999.  All but one of the ten missed payments claimed by Capital City are undisputed, and

the court finds that the one disputed missed payment was indeed missed.

Stewart failed to tender payment in October, November, and December of 1998. Again in February, March April, May, June, and July of 1999, Stewart did not pay Capital City. Stewart contends that she paid Capital City in January 1999 and has a letter from her attorney to Capital City, along with a copy of the money order as proof that she sent the payment. She has this proof for other payments as well, but this is the only payment, for which she has a copy of a money order, that Capital City claims it did not receive and that it did not credit to Stewart's account. Stewart did not take any steps to verify that Capital City received the payment, like tracking the money order; she had the ability to track the payment and inexplicably did not. Therefore, the court will not recognize a payment in January 1999. Thus, the court finds that there were 10 payments of $380.72 in arrears up to and including July 1999.

In July 1999, Stewart's counsel and Mr. Thomas K. Nash, current president of Capital City, arranged for Stewart to make a payment of $1,523.20. That accounts for four months of payments (without late fees, which are addressed *infra*). Thus, Stewart was behind a total of 6 payments in July 1999

27

($2,284.32 without late charges).

The Note allows for Stewart to be charged a 5% late charge if the Note Holder has not received the full amount of any monthly payment by the end of 10 calendar days afer the due date.  The due date is the 5th of every month.  The late fee amount is $19.04.  Stewart has not paid ten late fees that were owed to Capital City.[15]  That is a total of $190.40 in late charges that are allowed by the court.[16]  According to the Note, this is a one-time late charge.  Capital City cannot collect interest on the late charges, as no provision of the Note or Deed of Trust provided for such interest.

If the payments are not made, Capital City has the option to accelerate the Note and require the full amount of the principal and interest to be tendered.  Interest continues to accrue on the unpaid portion of the principal.  The one-time late payment is independent of and does not halt the accrual of interest on the sums not timely paid.  However, there is no

---

[15]  Stewart paid her July 1997 bill on 25 August 1997, her August 1997 bill on 23 September, her September 1997 bill on 10 October and her October 1997 bill on October 23.  In 1998, a check bounced in March and that payment was made up in April. In 1999, she paid her March bill on  May 5 and did not pay her April, May and June bills.

[16]  As already noted, Stewart produced no evidence of the money order having been remitted by Capital City and therefore will not be given credit for the payment.

28

provision for "interest on interest" within the Note; that is, a provision that would allow the accrual of interest at the Note rate for the portion of the missed payment that was to be an interest payment.  Capital City's compensation for the missed payment is the 5 percent late charge.  A compensation of "interest on interest" was not a negotiated term.  Stewart negotiated the terms of the 1996 Note, Deed of Trust and Settlement Agreement specifically to avoid the predatory nature of her original loan.  Part of the predatory nature of the loan that she was attempting to extract herself from was the ability of the mortgage company to charge fees not specifically negotiated for or contemplated in the agreement between the parties.  Because there is no provision for "interest on interest," it will not be permitted.

E.

MISCELLANEOUS CHARGES

In March 1998, Stewart tendered a check to Capital City that was returned for insufficient funds.  Capital City charged a fee of $25.00 for that incident and that charge will be allowed.[17]  It is a charge that is an expected charge for consumers who overdraw their checking accounts when paying a

---

[17]  That charge appears on the loan ledger on April 14, 1998.

merchant or lender.

In October 1998, Capital City apparently incurred a $95 charge for inspection of 3401 Brothers Place in contemplation of a foreclosure of the property. According to the testimony of Steven Kuhn, comptroller of Capital City, Stewart made nine payments in 1998, including a make-up payment for the bounced check in March 1998. However, Stewart hadn't made payments for months on end, and thus, Ms. Stewart was in default. This charge will be allowed as a cost due to Stewart's default.

In February 2000, a $68 charge appears on the loan ledger. The court has documentation of two loan pay off/bring current computation dated February 14, 2000. Each are for $34. The date of the statements are different, but the dates on the cover sheets are the same. It begs the question why two of these statements were needed for the same date. The question not being answered and Capital City not having put forth any evidence on the matter, both charges will be disallowed. Regardless, both charges would have been denied for their failure to show how this computations was a "cost incurred" by Capital City since it appears to be an internal document and no evidence having been presented to the contrary.

In the loan ledger on July 20, 2000 there is a $5 copy charge. That will be allowed.  In the loan ledger on 10/6/00, there is a $3 charge for cab fare.  That will be allowed as a cost incurred by Capital City in enforcing Stewart's Note.

F.

LEGAL FEES

Stewart raises a number of issues with the attorney's fees that Capital City has charged to her loan since August 1996.  The primary issue is whether Capital City can recover from Stewart attorney's fees for legal services provided by in-house counsel.

Stewart contends that the Agreement does not allow for such recovery.  Ancillary to that issue is the amount of the recovery. Stewart has posited that if Capital City can receive in-house counsel fees, that fee recovery can only be the actual cost that Capital City pays the attorney for the time that was spent working on Stewart's account.  Stewart contends that the rate of billing seen in the loan ledger exceeds the amount that Capital City paid to its in-house counsel and that it is inappropriate and unallowable under the loan for Capital City to use the legal office as a profit-generating center. Stewart also has concerns as to the particularity of the billing.

The court will address each of these issues in turn.  The Bankruptcy Code allows for the payment of attorney's fees for oversecured creditors in a limited amount of cases under 11 U.S.C. § 506.  To be allowed, four factors must be satisfied.

> To sustain a claim for fees pursuant to this section a creditor must demonstrate that: (1) the creditor has an allowed secured claim; (2) the creditor is oversecured; (3) the agreement upon which the creditor's secured claim is based provides for the recovery of the fees and costs; and (4) the fees and costs are reasonable.

In re Ward, 190 B.R. 242, 245 (Bankr. D. Md. 1995), citing In re California Props No. 1, Ltd., 132 B.R. 191, 192 (Bankr. M.D. Ala. 1991).

The creditor, Capital City, has an allowed secured claim to the extent of the amount of its claim and the value of the collateral.  The only issue with respect to the that claim is the amount of the secured claim.  That first factor having been satisfied, the court will address the remaining factors in turn.

### 1. Does 11 U.S.C. § 506 apply?

The first statutory provision the court draws upon is 11 U.S.C. § 506, Determination of Secured Status.  Section 506 sets out the guidelines for a secured versus unsecured claim.[18]

---

[18]  Of course, section 506 applies to Chapter 13 cases. See Wilson v. Commonwealth Mortgage Corp., 895 F.2d 123 (3d

32

Section 506(b) allows the holder of a secured claim to recover interest and any reasonable fees, costs, or charges provided for under the agreement that allowed the secured status of the claim, as long as the claim is oversecured.  An oversecured claim, per section 506, is a claim that is "secured by property the value of which. . .is greater than the amount of such claim."

There was no testimony regarding the value of the property of 3401 Brothers Place. The court has evidence that the first deed of trust was granted for $26,000 in 1993.  In 1996, the Modified Deed of Trust was entered into for $37,500. The proof of claim filed was for $41,726.09 (including arrears of $4,914.02).  Stewart's property is a single family residence. The court admitted into evidence tax assessments for the years 2000, 2001, and 2002.  Those assessments were for $102,210, $112,075, and $110,842, respectively.  While tax assessments are not conclusive valuations with respect to real property, they do provide a guideline and this case is not a close call.  The tax assessment exceed the exposure of Capital City by more than $60,000 (at its lowest value tax assessment).  There is no question that this creditor is oversecured.  Thus, this creditor's claim is oversecured under

─────────────────────

Cir. Pa. 1990).

§ 506(a).

## 2. The Language of the Documents

Having determined that the claim is oversecured, this court turns to examine if attorneys' fees will be allowed in this case and in what instance they will be allowed. The parties do not dispute the validity of their contractual agreements to pay attorneys's fees and costs of collection. Stewart's concerns are about the instances Capital City charges for attorney's fees, the reasonableness of the fees, and whether those provisions allow for the collection of fees by in-house counsel, and if so, at what rate.

This court will start its examination with the Supreme Court's decision in <u>U.S. v. Ron Pair Enterprises, Inc.</u>, 489 U.S. 235, 241 (1989). That court stated

> Recovery of fees, costs, and charges, however, is allowed only if they are reasonable and provided for in the agreement under which the claim arose. Therefore, in the absence of an agreement, postpetition interest is the only added recovery available.

<u>Id</u>. Thus, in order to determine whether or not fees for in-house counsel (or any attorneys' fees) will be allowed, this court will look first to the language of the Settlement Agreement, Note and Modified Deed of Trust.

The Settlement Agreement allows for the collection of fees and expenses in very limited instances. Paragraph 3

34

reads

> In the event that any party **breaches** any of the
> covenants, undertakings or warranties of this *Agreement
> and Release,* any party that is damaged by the breach will
> be entitled to **damages** from the breaching party,
> including the amount of **any counsel fees and other
> litigation expenses** <u>incurred</u> in enforcing this *Agreement
> and Release.*

[Bold emphasis and underlining added.]

However, Stewart was never in breach of the Settlement
Agreement.  With respect to any tax and insurance payments
required by the Settlement Agreement that she missed, Stewart
was entitled to notice and an opportunity to cure the default.
Stewart never had such notice under the Agreement, so there is
no uncured default, and no breach.  Therefore, no attorney's
fees can stem from the Settlement Agreement.

The Note also has a provision that allows for the
collection of attorneys' fees.  Paragraph 6(E), Payment of
Note Holder's Costs and Expenses, states

> If the Note Holder has required me to pay immediately in
> full as described above [in the event of a default], the
> Note Holder will have the right to be **paid back** by me for
> all of **its costs and expenses** in enforcing this Note to
> the extent not prohibited by applicable law.  Those
> expenses include, for example, **reasonable attorneys'
> fees**.

[Emphasis added.]

Paragraph 1 of the Modified Deed of Trust states that the
Grantor covenants

> That he will pay the indebtedness evidenced by the note
> secured hereby, all taxes and assessments relating to the
> land and premises herein described, ground rents, all
> charges against the property, and all of the sums which
> are **required to be paid by him under the terms of said
> promissory note or this Deed of Trust**, including costs,
> expenses and **attorney's fees** *incurred* **by the . . . holder
> of said note** with respect to this trust, the said note or
> the land and premises herein described . . . .

[Emphasis added.]  This quoted language does not purport to

allow all attorney's fees related to the Note or Deed of

Trust, but only those required to be paid under other terms of

the Note or Deed of Trust, and it limits such fees to fees

*incurred*.

Paragraph 7 of the Modified Deed of Trust also references

attorney's fees in the context of a foreclosure.  In that

paragraph, the method of distribution of the proceeds of a

foreclosure sale are spelled out.  The proceeds of the sale

are applied

> FIRST, to pay all proper costs and charges,
> including but not limited to court costs,
> advertising expenses, auctioneer's allowance, the
> expenses, if any, required to correct any
> irregularity in the title, premium for Trustees'
> bond, auditor's fee, **attorney's fee**, and all other
> expenses of sale *incurred* in and about the
> protection and execution of this trust . . . .

[Emphasis added.]

Other courts that have examined whether in-house counsel

fees were permissible relied heavily on the language on the

36

note in question to make that determination.  In order for this court to find that Capital City can be compensated for the work of its in-house counsel, the Deed of Trust or Note must provide for it.  In examining the language of the three different documents, the word incur comes up in two of the three.  Incur means "to become liable or subject to."[19]  It is generally accepted that you do not incur an obligation to yourself, an obligation is incurred to another individual or entity.

Only the Note language does not use the word "incur," but it states that the Note Maker has the right to be "paid back" for reasonable fees in enforcing the obligation after acceleration.[20]  The term "paid back" is the equivalent of "incurred."  Accordingly, the court need not address whether the Deed of Trust modifies the Note with its language regarding attorney's fees that are "incurred" by the Trustee. Reading the two documents as being in harmony, no attorney's fees can stem from the Deed of Trust or Note that are not actually incurred by Capital City.

Therefore, after looking at the requirement for

---

[19]  Merriam-Webster Online Dictionary. Http://www.m-w.com.

[20]  Only a small portion of the in-house attorney charges at issue arose before acceleration.

37

reasonable fees generally, the court will examine under what instances other courts have allowed (or disallowed) the recoupment of in-house attorney's fees.

### 3. Reasonableness of Fees

As noted in 4 Collier on Bankruptcy, 506.04[3][a], there is a split of authority over the issue of whether state or federal law governs the determination of the validity of a provision requiring the payment of attorneys' fees. (15th ed. rev'd Dec. 1999, at 506-114 to 117). The court can disallow charges that it deems are unreasonable, regardless of which law controls the provision. See 4 Collier on Bankruptcy ¶ 506.04[3][a][ii] at 506-117 through 506-119 (15th ed. rev'd Dec. 1999). The court believes that the correct view is that the reasonableness of a fee that is allowable for an oversecured claim under § 506(b) is determined as a matter of federal law. In re Welzel, 275 F.3d 1308 (11th Cir. 2001).[21] However, the outcome here would be the same even if state law

---

[21] Accord, In re B& W Management, Inc., 63 B.R. 395, 401 (Bankr. D. D.C. 1986). See also Unsecured Creditors' Committee v. Walter E. Heller & Co. Southeast, Inc., 768 F.2d 580, 585 (4th Cir. 1985); see also In re Duralite Truck Body & Container Corp., 153 B.R. 708, 713 (Bankr. D. Md. 1993); In re Harper, 146 B.R. 438, 443-45 (Bankr. D. Ind. 1992); In re Clark Grind & Polish, Inc., 137 B.R. 172, 175-76 (Bankr. W.D. Pa. 1992). This oversight ensures fairness to all creditors. See In re Korangy, 106 B.R. 82, 85 (Bankr. D. Md. 1989).

set the standard of reasonableness, as District of Columbia law would require the fees to be reasonable.   The fees must be reasonable under the facts and circumstances of the case. Creditor's counsel does not have a blank check for automatic payment of fees and reimbursement of expenses. <u>In re Ward</u>, 190 B.R. at 245; <u>In re Oliver</u>, 183 B.R. 87, 91 (Bankr. W.D. Pa. 1995); <u>In re Davidson Metals, Inc.</u>,(Bankr. N.D. Ohio 1993), <u>aff'd</u>, 65 F.3d 168 (6th Cir. 1995). Section 506(b) provides that an oversecured creditor may be compensated for "reasonable fees, costs or charges."  Under § 506(b), "reasonable fees" has been interpreted as those fees which are "necessary to the collection and protection of a creditor's claim." <u>In re Huhn</u>, 145 B.R. 872, 876 (Bankr. W.D. Mich. 1992); <u>In re Kroh Bros. Dev. Co.</u>, 105 B.R. 515, 521 (Bankr. W.D. Mo. 1989).  Stated another way, an oversecured creditor is entitled to recover under § 506(b) those fees which were reasonably necessary to protect its interest.  <u>In re Schriock Constr., Inc.</u>, 176 B.R. 176, 183 (Bankr. D. N.D. 1994). Indeed, the court cannot completely disallow a request for attorney's fees from an over-secured creditor when the security agreement provides for the payment of such a fee. <u>Manufacturer's Nat'l Bank v. Auto Specialties Mfg. Co. (In re Auto Specialties Mfg. Co.)</u>, 18 F.3d 358 (6th Cir. Mich. 1994).

In Copeland v. Marshall, 641 F.2d 880, 891 (D.C. Cir. 1980) the Court of Appeals set forth a "lodestar" approach, which it has endorsed for use in bankruptcy matters. In re AOV Industries, Inc., 797 F.2d 1004 (D.C. Cir. 1986).

The Copeland court recognized the twelve "lodestar" factors outlined in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), when determining the reasonableness of fees. The factors are:

(1) time and labor required;

(2) novelty and difficulty of the questions raised;

(3) the skill required to properly perform the legal services rendered;

(4) the preclusion of other employment by the attorney due to the acceptance of the case;

(5) the customary fee charged for like work;

(6) whether the fee sought is fixed or contingent;

(7) the time limitations imposed by the client of the circumstances;

(8) the amount in controversy and the results obtained;

(9) the experience, reputation, and ability of the attorney;

(10) the "undesirability" of the case;

(11) the nature and length of the professional

40

relationship between the attorney and the client; and

(12) attorney fee award in similar cases.

<u>Id</u>.  The D.C. Circuit court noted in <u>Copeland</u>, at 890, that

the "lodestar" factors do not end the inquiry into attorney's

fees.

> Simply to articulate those twelve factors, however, does
not     itself conjure up a reasonable dollar figure in the
>        mind of a district court judge.  A formula is
>        necessary to translate the relevant factors into
>        terms of dollars and cents.  This is particularly
>        true because the twelve factors overlap
>        considerably.

<u>Id.</u>     The 1994 Amendments to the Bankruptcy Code codified

some of the "lodestar"  factors under § 330(a)(3)(A) and

(a)(4)(B) (compensation of estate officials).

   *4. In-house counsel fees as within contemplation of Note.*

   Courts have found that "[a]n oversecured creditor is not

barred from recovering in-house counsel fees if fees are

authorized by contract, and if the creditor can demonstrate

that the fees were reasonable, actual, and necessary."  <u>In re

Tarkio College</u>, 195 B.R. 424, 430 (Bankr. W.D. Mo. 1996),

(<u>citing</u> <u>Milgard Tempering, Inc. v. Selas Corp. of America</u>, 761

F.2d 553, 558 (9th Cir. 1985)).  The critical issue is whether

the contract here authorized the recovery of such in-house

counsel fees.

   Attorney's fees for services of in-house counsel who act

41

primarily as liaisons between the client and outside counsel
are not recoverable under a contractual or statutory provision
for the recovery of attorney's fees.  Federal Deposit
Insurance Corporation v. Bender, 182 F.3d 1, 5 (D.C. Cir.
1999);  Burger King Corporation v. Mason, 710 F.2d 1480, 1499
(11th Cir. 1983), cert. denied, 465 U.S. 1102 (1984).

However, where a statute or contract provides for
recovery of attorney's fees, and in-house counsel, as here,
actually handles the litigation, the litigant is entitled to
recover the cost of such in-house counsel performing the work.
See Wisconsin v. Hotline Indus., Inc., 236 F.3d 363, 365 (7th
Cir. 2000);  Textor v. Bd. of Regents of Northern Ill. Univ.,
711 F.2d 1387, 1396 (7th Cir. 1983) ("Defendants chose to hire
in-house counsel because that was the most efficient means of
handling a large amount of legal work.... [F]or every hour
in-house counsel spent on this case, defendants lost an hour
of legal services that could have been spent on other
matters");  Delaware Valley Citizens' Council v. Pennsylvania,
762 F.2d 272 (3d Cir.1985), rev'd on other grounds, 483 U.S.
711 (1987);  Softsolutions, Inc. v. Brigham Young University, 1
P.3d 1095, 11106 n.5 (Utah 2000) (citing numerous federal and

state decisions).[22]

However, <u>In re Davidson Metals, Inc.</u>,(Bankr. N.D. Ohio
1993), <u>aff'd on appeal by parties seeking to reduce fee award</u>,
65 F.3d 168 (6th Cir. 1995), may hold to the contrary.   There,
in-house counsel assisted outside counsel in litigating a
case, and much of in-house counsel's efforts were a
duplication of effort, and as to independent work, it sought
to bill at a rate that necessarily included an unquantified
profit element.   The court nevertheless went on to suggest
that § 506(b) does not allow in-house counsel's salary and
associated costs to ever be recovered under an agreement
calling for recovery of fees incurred or paid.[23]   The court

_____

[22] <u>In re Cummins Utility, L.P.</u>, 279 B.R. 195, 207 (Bankr.
N.D. Tex. 2002), denied fees sought for the in-house counsel
of the creditor because the time of the creditor's counsel
should be included in overhead without further explanation.
The creditor was a bank that was a member of a group of lender
banks that had JP Morgan Chase Bank act as the group's agent.
<u>Id.</u> at 197 n.1.    As agent, Chase employed counsel in the
litigation.   <u>Id.</u> at 200.   Accordingly, <u>Cummins Utility</u> may
stand for nothing more than the principle enunciated by
<u>Bender</u>, 182 F.3d at 5, that disallows fees for in-house
counsel acting as a liason.

[23] The security agreements in <u>Davidson Metals</u> allowed the
creditor, Society, to recoup "attorney's fees and every other
cost, expense or liability, if any, incurred or paid by
[Society] in conection with [the security agreements]," and
further required the debtor to "indemnify . . . [Society] from
and against every out-of-pocket cost, expense, loss or
liability . . . incurred by [Society] by reason of this
Security Agreement."

stated:

> The Court fails to see how the cost of employing in-
> house counsel is directly attributable to [the
> debtor's] security agreements.  Looking at it
> another way, nothing in the loan documents requires
> [the debtor] to assume responsibility for paying any
> portion of Society's pre-existing overhead costs,
> namely, the continuing salary, benefits, etc. of its
> employees.  Whatever obligation exists to compensate
> in-house attorneys remains with Society.  Society
> has cited no persuasive statutory or case law
> authority for their proposed policy that would, in
> effect, make in-house legal departments profit
> generating centers.

Davidson Metals, 152 B.R. at 923-24.  See also Burger King,

710 F.2d at 1499 and n.13 (party did not pay out additional

money for the services of its house counsel, so under

indemnification agreement it cannot claim "reimbursement" for

portion of its fixed corporate expense for in-house counsel

attributable to the litigation) (dicta).[24]

---

[24]  Cf. First Bank of Ohio v. Brunswick Apts. of Trumbull
County, Ltd. (In re Brunswick Apts. of Trumbull County, Ltd.),
215 B.R. 520, 522 (6th Cir. B.A.P. 1998), aff'd, 169 F.3d 333
(6th Cir. 1999) (ordinary expense of salary, on non-overtime
basis, for in-house non-attorney employees incident to
litigation, would have been incurred anyway and is not
recoverable under note provision for expenses incurred after
referral to attorney).  See also In re Hernandez, 303 B.R. 342
(Bankr. S.D. Ohio 2003) (same).

Brunswick and Hernandez are distinguishable from this
case.  For example, in Brunswick, the note provided that if
the note was "referred to an attorney at law for collection or
if any action at law or in equity is brought with respect
hereto, the undersigned promises to pay Lender all expenses
and costs, including but not limited to reasonable attorney's
fees."  The court in Brunswick properly declined to allow

The court declines to follow Davidson Metals and Burger
King in this regard, as they fail to recognize the injured
party's extraordinary out-of-pocket expense of paying its in-
house attorney's salary for the time spent actively litigating
a matter that could have been devoted to other attorney
matters.  Unless the parties' contract clearly excluded fees
of in-house counsel, the salary expense and allocable overhead
of such counsel are expenses incurred.

Moreover, later decisions cast doubt on the soundness of
Davidson Metals and Burger King as precedent of relevance to
this case.  As to Davidson Metals, a decision out of the same
bankruptcy court has held Davidson Metals to be
distinguishable on facts similar to Stewart's.  In In re
Outdoor Sports Headquarters, Inc., 161 B.R. 414, 426 (Bankr.
S.D. Ohio 1993), the court distinguished Davidson Metals
because the creditor in Davidson Metals had outside as well as

---

recovery of any part of the salaries paid in-house non-
attorney personnel who were called upon to communicate with
the creditor's outside counsel.  The decision can be justified
on the grounds of reasonableness.  Such an expense is not
ordinarily thought of as an expense of litigation, as the non-
attorney personnel are effectively the client and their salary
does not arise as an expense of referring the matter to an
attorney.  Except in extraordinary circumstances (such as
payment of overtime necessitated by the litigation), such
expenses are not viewed as expenses incident to the
litigation.  oversecured creditor was not entitled to increase
claim by amount of in-house counsel fees, as such fees were
not "out of pocket").

in-house counsel, while the creditor in <u>Outdoor Sports</u> did not
employ outside counsel, and the creditor would have been
expected to use in-house counsel, such that the
indemnification provisions of the note would not have made
sense unless it extended to in-house counsel.  Here, Stewart
had already been dealing with in-house counsel prior to
execution of the Note.  Moreover, the distinction is
irrelevant because it is widely known, and would have been
understood by Capital City and Stewart, that corporations
often turn to in-house counsel who can deliver services at a
lower cost incurred than would be the case if outside counsel
were employed.      As to <u>Burger King</u>, a decision out of the
same circuit, <u>Salisbury Laboratories, Inc. v. Merieux</u>
<u>Laboratories, Inc.</u>, 908 F.2d 706, 715 (11th Cir. 1990),
distinguished <u>Burger King</u>, and allowed in-house attorney's
fees under a Georgia statute allowing a party to recover
expenses of litigation caused by an opponent's acting in bad
faith.  Here, the Note similarly authorized the recovery of
expenses of litigation.

     *5.  Proper Hourly Rate for In-House Attorney's Fees.*

     Although, as just concluded, Capital City is not required
to have made payment to outside counsel in order to recover
attorney's fees here, the use of the words "incurred" and

"paid back" in the Note and Deed of Trust require the court to hold that the hourly rate to be employed in fixing fees is not a market rate (save as a cap on the fees), and thus Capital City may not recover the reasonable fees that outside counsel would have charged.  The use of the words "incurred" and "paid back" makes relevant those decisions dealing with statutes that allow fees "incurred": the fees are to be based on the actual costs of the provision of services, not the market rates that the consumer of the services would have been required had an outside firm performed the services with a profit element.  See Wisconsin v. Hotline Indus., Inc., 236 F.3d 363, 368 (7th Cir. 2000) (under 28 U.S.C. § 1447(c), which provides for recovery, in certain circumstances, of fees "actually * * * incurred," a court must award the "actual amount of fees incurred.");[25] Washington Metro. Area Trans. Auth. v. United States, 57 Fed. Cl. 148 (2003) (statute permitting court to "reimburse" a plaintiff for reasonable attorney's fees and costs that were "actually incurred").

---

[25]   Nevertheless, some courts hold that such fees must be reasonable even though the statute does not use the term "reasonable."  See Huffman v. Saul Holdings Limited Partnership, 262 F.3d 1128, 1135 (10th Cir. 2001) ("unreasonably high fees are not 'incurred' as a result of removal; rather, excessive fee requests flow from, and accumulate by means of, improper billing practices * * *.") That is not an issue here, as 11 U.S.C. § 506(b) requires that the fees be reasonable.

47

The same applies in the case of contracts.  See Softsolutions, Inc. v. Brigham Young University, 1 P.3d 1095 (2000)(rejecting the market-rate approach because it would award the salaried attorney's employer a windfall profit; holding that cost-plus rate which included calculation of overhead expenses was the more reasonable measure of attorney fees for in-house counsel).

Although Milgard Tempering, Inc. v. Selas Corp., 761 F.2d 553 (9th Cir. 1985) refers in dictum to "the modern trend toward providing reasonable fees based on the market rate" for in-house counsel who actively participated in litigation, this remark is inexplicable (unless it is read as meaning that market rates are used as a cap on what can be a reasonable award for in-house counsel work).  None of the decisions it cited for this proposition referred to a market rate, and, indeed, as the court acknowledged, one of them, Lacer v. Navajo County, 687 P.2d 400, 404 (Ariz. App. 1984), awarded fees based on the actual costs plus overhead for government attorney staff.  As the Davidson Metals court properly recognized, 152 B.R. at 923, any allowed fee for in-house counsel services ought not include an element of profit as is reflected by market rates.

Moreover, even when a fee-shifting statute awards "reasonable attorney's fees," the courts will usually limit fees for in-house counsel to actual cost because of ethical concerns.[26]  When the statute or contract refers only to fees "incurred," the ethical concerns are secondary as the language "incurred" simply does not contemplate looking to market rates.

The attorney's fees charged to Stewart sometimes arose when Capital City's office of general counsel submitted charges for its services, at the rate of $110 per hour, to the president of Capital City for his approval, and eventual charge to Stewart.  There is no evidence of how this $110 per hour rate was derived, and it may include a profit margin.

----

[26]  See Harper v. Better Business Servs., Inc., 961 F.2d 1561, 1564 (11th Cir. 1992); National Treasury Employees Union v. Department of the Treasury, 656 F.2d 848, 850-53 (D.C. Cir. 1981); Anderson v. Department of the Treasury, 648 F.2d 1, 3 (D.C. Cir. 1979).  There is no evidence on this record that the recovered fees will not directly benefit Capital City.  Capital City's general counsel office is set up to serve Capital City's needs, and it is the entity that will benefit from the recovery of fees, not some third parties represented by the general counsel office.  Accordingly, this case does not fit within the exception of American Fed'n of Gov't Employees v. Federal Labor Relations Auth., 944 F.2d 922, 935-37 (D.C. Cir. 1991), where structures were in place via a separate account for union lawyers representing union members, thereby avoiding concerns about fee splitting with the union and the unauthorized practice of law.  See also  Curran v. Department of the Treasury, 805 F.2d 1406, 1408-09 (9th Cir. 1986).

Accordingly, the court cannot conclude that the charges are based on actual costs incurred.

Although Capital City would write a check to its office of general counsel for the amount of attorney's fees charged, this changes nothing: that is only an internal shifting of Captial City's funds, and does not reflect an actual cost of the services provided.[27]  Capital City has thus not carried its burden of showing that the charges are recoverable.

### 6. *Specific Attorney Fee Charges and Expenses*

Even if the court accepted Capital City's hourly rate used for its attorneys, the court would still have to examine the request for costs and fees for reasonableness using the factors laid out earlier in this opinion.  The court will go

---

[27]  It is impossible to determine from the record the exact arrangement between Capital City and its in-house counsel.  Exhibit 11 submitted by Capital City is a record of in-house counsel costs that consists of "Client Billing Worksheets" from the Office of General Counsel that show an hourly rate and billing time in addition to a bare-bones description of the work.  Those are provided for only some of the charges.  There are also cancelled checks from Capital City Mortgage Corp. Loan Services to "CCMC-A/M."  The totals for these checks do not correspond to the totals for the legal bills attributed to Ms. Stewart.  The memo portion of some of the checks read "Office of the General counsel – Legal Bill."  That begs the question, if Capital City has in-house counsel, why is it writing itself checks for that fee?  If no clients' accounts for a month require enforcement services, does that mean that in-house counsel do not get paid for that month?  The question is left unanswered but the court doubts that is the case.

through this exercise and show that, with the exception of the
year 2000 loan ledger charges for attorney's fees that are
supported by billing statements and which are not internally
contradictory, most of these charges are unreasonable given
the lack of the evidence presented to support them.

If, after examining the terms of the note and deed of
trust, the court had determined that the creditor was entitled
to a fee award, and such an award was requested by the
creditor, the court would have to examine the application made
by the creditor.  To that end, the "creditor's counsel's fee
application should be unambiguous and virtually self-contained
so that by reviewing it and the underlying itemized billing
information, the court can reach an informed determination of
the reasonable fee." In re Kalian, 178 B.R. 308, 317 (Bankr.
D.R.I. 1995).[28]  It is the creditor's burden to prove that
those costs were incurred in the same way that a creditor

---

[28]  The courts have required evidence of the work
accomplished on behalf of the creditor with respect to the
account in question.  An oversecured creditor has not been
allowed to recover attorney fees to the extent individual
entries in itemization of work were nondescriptive.  Davidson
Metals, 152 B.R. at 920.   In determining the reasonableness
of the fees charged by in-house counsel, the court generally
looks at a number of factors.  The court enjoys broad
discretion in determining whether the proposed fees and costs
are "reasonable."  In re Kroh Bros. Dev. Co., 105 B.R. 515,
520 (Bankr. W.D. Mo. 1989); see also In re Stoecker, 114 B.R.
980, 983 (Bankr. N.D. Ill. 1990).

hiring outside counsel must produce billing statements from that counsel to show that legal costs were incurred.

Capital City's fee application, through trial exhibits and counsel's statements, is anything but unambiguous and self-contained.  The manner of submission of Capital City's in-house counsel fees and the lack of testimony regarding such fees leaves the court with more questions than answers.  Since the burden of proof lies with Capital City, Capital City will bear the burden of the court's confusion.

The reason the Note and deed of trust were renegotiated during Stewart's first bankruptcy was to limit the amount of fees that could be tacked on to Stewart's loan and avert the predatory nature of the loan.  As early as December 1996, Capital City charged Stewart's account a legal fee of $40.  The only item in the trial records that originated from Capital City during the same approximate time period is a November 4, 1996 letter which consists of two lines and less than 50 words.  It states that Capital City's counsel has enclosed a copy of the fully executed release as requested by Ms. Docter.  First and foremost, there had been no breach or instance of default that would allow Capital City to charge Stewart's account for legal fees.  There was no breach in November of 1996 that would allow recovery of attorney's

52

fees.[29]

In February 1997, there are a number of fees that appear
and are unclassified.  The first, on February 6, is a $40
charge the court will presume is misclassified as a
miscellaneous fee when it should have been a legal fee.  Forty
dollars is a standard legal fee charged by Capital City and
there is no other supporting documentation.[30]  The Notice and
Order of Condemnation had already been issued and Capital City
had ordered the "repair" of Stewart's property (see above).
There is no explanation of the fee for either February 6 or
February 18.  Therefore, the court will not allow those fees
to be collected.

The same is true for the fee on March 6, 1997.  Capital
City argues that Stewart was in default at this time because

───────────────

[29]  Moreover, the letter, which would take an
inexperienced typist 3 minutes to complete (and that's a
generous estimate), contains no legal advice and has no legal
ramifications that require an attorney's review.  An
administrative clerk in the Capital City offices could have
composed that letter and made the copies of the settlement
agreement and release.  The $40 charge will be disallowed on
these alternative grounds that it is unreasonable to charge
$40 for a two-line letter that was ministerial in character
requiring no significant attorney involvement.

[30]  There is a check dated February 5, 1997 to a Barbara
Taylor with a reference to the "Janis Stewart Property" in the
Memo portion of the check.  However, the record contains no
further explanation of that charge or who Barbara Taylor is,
and for that reason it will be disallowed.

she had violated the Deed of Trust by allowing the structures on the property to deteriorate to a point where the city has issued a Notice and Order of Condemnation and this entitles them to attorney's fees.  However, the only testimony on the topic is that Stewart was never contacted by Capital City with respect to this issue and there are no letters in the file that would document exactly what, if any, legal services performed.  A mere entry into a ledger stating a monetary total is not enough to allow Capital City to recoup for work allegedly performed.

In January 1999, there was a $90 charge to Stewart's account.  The creditor's supporting evidence is the memo portion of a check to be drawn for a total of $962.50.  On the memo portion it also states "STEWART – $90.00."  That charge will be disallowed for want of any information about the legal services performed.

In May 1999, a number of legal charges were posted to Stewart's account.  There are charges for $225, $4.39, and $1. The record contain some documentation of the $225 charge – a piece of paper that states "D.C. Foreclosure – Phase One," Stewart's general information, and a fee of $225; the other two charges have no accompanying documentation.  There is no explanation of what "Phase One" entails, no explanation of the

54

services performed or who performed them.  It is unclear that
any  legal services were performed by an attorney or legal
professional.  Capital City, who bore the burden of proof on
this issue, presented no evidence on this matter.  All three
charges are disallowed for lack of specificity.

Again in June 2000, there are legal charges for $1,
$20.18, $25, $225, and $6.42.  For those charges, Capital City
submitted a copy of a cancelled check in the amount of $172.50
to "Cash" with "Fidel M. – out of pocket" in the memo line and
an apparently corresponding ledger with a great deal of
incomprehensible scribbling on it.  The name "Fidel Mogrovejo"
followed by the words "Out of Pocket" appear along with many
other scribbles.  There is no way for the court to make sense
of this submission.  It will simply deny whatever charges were
supposed to stem from that submission (which appear to be $1,
$20.18, and $6.42) for lack of specificity.

Throughout the ledger, including in June 2000, there are
bills for in-house courier services.  Again, these charges
will be disallowed for lack of adequate detail.[31] For example,

---

[31] The court has no evidence other than a cover sheet,
entitled "Courier Services" with Capital City's address and
information on it as well as a flat fee typed on the form
(other portions of the form are hand written).  There is no
evidence as to who performed those courier services.  Thus,
the court can only go from the information on the form and
reason that it was an internal form with deliveries made by

there is a $25 courier services fee, for service to/from the
Recorder of Deeds without a date of service and no description
of who performed the services or the reason for the courier to
go to the Recorder of Deeds.

The June 2000 charge of $225 has documentation – a piece
of paper that states "D.C. Foreclosure – Phase Two,"
Stewart's general information, and a fee of $225.  There is no
explanation of what "Phase Two" entails, no explanation of the
services performed or who performed them.  It is unclear that
any legal services were performed by an attorney or legal
professional.  Also included is a cancelled check for $2025,
with no explanation other than "Foreclosure Phase 2."  This
will be a disallowed charge due to lack of specificity.

On July 12, 1999 there is a $50 legal fee.  That fee has
no documentation in Exhibit 11 (the exhibit that purports to
illustrate Capital City's legal expenses).  However, in July
1999 there were a number of letters between Thomas Nash and
Marcia Docter.  Capital City agreed to accept a payment of
$1523.20 to cancel a scheduled foreclosure.  Nash was
president of Capital City.  Thus, Nash's time should not and
could not be charged as a legal service.  There being no other

_____

Capital City employees as part of their regular duties and
thus would be included in overhead.

documentation for this charge, the charge will be disallowed.

In November 1999 there is another charge of $225 for D.C. Foreclosure - Phase One."  This charge being no different than the previous charges of the same title, and no further explanation regarding the charge having been given by Capital City, this charge will be disallowed.

The ledger sheet does not appear to reflect a $20 recording charge from the Recorder of Deeds from December 14, 1999, which the court found in Defendant's Exhibit 11.  That charge may be added to the ledger and will be allowed by the court.  There is also a December 13, 1999, fee for $1 for a notary on a receipt that is not on the ledger sheet.  That will added to the ledger as an allowed charge.

On January 3, 2000, there were charges for $225 and $25. The $25 fee is for courier services.  That fee is disallowed for the same reasons as above.  The $225 fee is for "D.C. Foreclosure - Phase Two."  That charge is disallowed for the same reasons as above, for lack of clarity and lack of specificity.

A charge posted to the ledger in February 2000 was actually incurred in December 1999.  It is for $160 (the billing worksheet total is $260 but the total is changed in handwriting to $160 without explanation).  **That fee will be**

**disallowed for lack of clarity and lack of specificity.**

Those are the only pre-petition charges for attorney's fees and expenses.  Other than the $20 recorder of deeds fee and the $1 notary, above, the charges for pre-petition attorney's fees and related expenses will all be disallowed for lack of evidence of Capital City actually incurring any costs or expenses due to Stewart's account.

Post-petition charges begin with a charge for $75 to cancel the foreclosure sale scheduled for January 28, 2000. That charge will be allowed, as it is clearly a cost incurred because of Stewart's default.

A January 21 charge of $21 is disallowed for lack of explanation, as is a January 28 charge of $11.43.

A February charge for $230 will be disallowed for lack of clarity and specificity.  All courier fees (three fees for $25 listed as $75 on the ledger) will be disallowed for that reason as well.

A March 13 entry seeks $1,230 for preparing the proof of claim ($680) and an opposition to Stewart's objection to that proof of claim ($550).  The court will disallow these amounts for the following reasons.

As to the proof of claim, attorneys' fees, if provided for by the parties' contract are not foreclosed under § 506(b)

on the basis that mode of assertion of the claim is peculiar
to federal bankruptcy law.  <u>Kord Enterprises II v. California
Commerce Bank (In re Kord Enterprises II)</u>, 139 F.3d 684, 687
(9th Cir. 1998).  Here, attorney's fees were limited to
enforcing the accelerated obligation under the Note (an
acceleration based on there having been a default).  This
warrants, for example, allowance of the filing fee paid for
the lift stay motion (seeking to proceed with foreclosure to
collect the accelerated debt).

In contrast, the filing of a proof of claim is an
assertion of amounts owed for purposes of distributions under
the Bankruptcy Code, not an attempt to enforce the entire debt
based on acceleration.[32]  It thus does not fall within either
the Note's or the Deed of Trust's provisions regarding
recovering attorney's fees.[33]

---

[32]    Payment pursuant to distributions under the
Bankruptcy Code does not turn on whether the debt has been
accelerated.  Here, the debtor's plan called for curing of the
default under the plan and resumption of regular monthly
payments.  Alternatively, it could have called for paying the
secured claim in full over time.

[33]    In this regard, paragraph 7 of the Deed of Trust
called for foreclosure sale proceeds to be applied first to
payment of "all proper costs and charges, including but not
limited to . . . attorney's fee, and all other expenses of
sale incurred in and about the protection and execution of
this trust," and certain other out-of-pocket expenses such as
real estate taxes paid, thus suggesting that attorney's fees
recoverable were those that relate to enforcing the note based

In any event, the court does not believe it appropriate to grant $680 for preparing a simple proof of claim.  The preparation and filing of a proof of claim was enforcement of the Note, but it was not an act that only an attorney can perform.  The proof of claim filed in the main case consists of a standard form (Official Form 10) requiring the entry of the pertinent case information, the creditor's contact information and the basis for the claim in summary fashion, along with the total of the claim.  Attached to that single sheet is a copy of the 1993 Note, a copy of the 1993 Deed of Trust, a copy of the loan ledger, a copy of foreclosure statement (which should already have been prepared in anticipation of the foreclosure scheduled for January 28) and an attachment that asserted the pre-petition payoff amount (this again was a simple form where the number should already have been calculated in anticipation of the foreclosure sale).[34]  Capital City has not shown that it was necessary for an attorney to prepare the proof of claim.  Even if Capital

---

on acceleration, that is, via foreclosure.

[34]  The court also notes that Capital City billed for editing of the proof of claim a day after it was filed with this court.  The proof of claim was filed with this court on February 1, 2004.  Ms. Watson billed for 6.8 hours to file the proof of claim.  Of those, 3.7 hours were billed on February 1 and 3.1 were billed for editing the proof of claim on February 2.

City had established that review by an attorney of the proof
of claim would have been warranted, the 6.8 hours of attorney
time spent would be a clear case of overreaching.

As to the responding to the objection to the proof of
claim, Capital City has not demonstrated that the objection is
without merit, and enforcement should be limited to work in
upholding the Note, not attorney's fees attempting to assert
amounts that are to be disallowed.  See Ward, 190 B.R. at 251,
quoting In re Gwyn, 150 B.R. 150 (Bankr. M.D.N.C. 1993)
(provision in contract clause for attorney's fees for
collection efforts ought not be read as including all activity
pursued in the bankruptcy case).

Courier service on March 8, 2000 and billed on April 5
will be disallowed for lack of specificity.

Capital City also filed a $750 bill for attorney's fees,
of which $660 were devoted, again, to the creditor's answer to
Stewart's objection to claim (a total of 6.60 hours).  That
bill states that Ms. Watson completed that work on March 7.
This is problematic because Ms. Watson filed Capital City's
reply to the objection to claim on February 23 and she had
already spent 4.5 hours on that same objection on the previous

billing sheet.[35]  Again, this is an excessive fee amount and it shows incorrect entries for the time of the counsel for Capital City.  Moreover, the objection to claim is being largely sustained, and attorney's fees ought not be allowed for work in defending a claim to the extent that work relates to a claim that is not owed.

On June 8, 2000, Capital City paid $75 to file a lift stay motion.  That charge appears in receipts submitted to the court and on the loan ledger on 6/30/00.  This will be an allowed post-petition charge.

On June 20, 2000 there is a charge for $858 in legal fees that were apparently incurred on May 8, 22, and 23 according to the billing sheets.  Those charges will be disallowed for lack of clarity and lack of specificity.

The June 8 and 26, 2000 courier fees of $28 each will be disallowed for lack of specificity.[36]

The 7/12/00 loan ledger entry for $1397 is for legal work performed on April 4 and 5, 2000.  The billing worksheet states that it is for preparation of pleadings and to fulfill

---

[35]  Ms. Watson did file with the court a notice of rescheduled hearing on the 8th of March along with a certificate of service.  This was a form that did not require counsel 6.60 hours to complete.

[36]  These charges appear on the ledger at 7/11/00.

discovery requests.  This charge will be disallowed for lack of clarity and lack of specificity.

The 7/13/00 loan ledger entry for $715 is comprised of 2 billing works sheets for correspondence, preparation of a Motion for Lift Stay, a response to a Motion for Sanctions and a status meeting with Mr. Nash, the president of Capital City. All those charges will be disallowed based on the lumping of tasks, and lack of specificity as to what some of the services entailed.   The 8/16/00 loan ledger entry for $605 is for the preparation for the Motion for Relief from the Stay and a court appearance on the same day as well as a court appearance for a hearing regarding the proof of claim.  Those charges will be disallowed based on lumping, and based on the court's previous ruling regarding responding to the objection to claim.

The 8/16/00 loan ledger entry for $28 for courier services will be disallowed for lack of specificity.

The last entry for legal fees on 9/14/00 will also be disallowed for lack of specificity.  It is a $44 charge for a letter to Ms. Docter.

From September 14, 2000 until December 31, 2002 there are no further entries for legal fees.

Finally, the court notes that there are no provisions for

63

the note rate of interest to be paid on attorney's fees or related expenses under the Agreement, the Note, or the Deed of Trust.   The previous note with Capital City, executed in 1993, allowed interest on attorney's fees in the event of  the filing of bankruptcy proceeding.   The court will not allow interest on the attorney's fees under the present Note at the Note rate.   However, as in the case of real estate expenses, the attorney's fees incurred here, via payment of in-house counsel's salary and allocable overhead, as well as related expenses such as the lift-stay motion filing fee, are an out-of-pocket expenses.   The deed of trust contemplated that paid expenses not timely reimbursed (in contrast to interest accruals not timely paid) are to bear interest at the legal rate (which is 6% per annum).   However, there is no evidence that Capital City made demand on Stewart for such fees and expenses prior to the filing of the proof of claim, and the postpetition fees and expenses were probably first brought to Stewart's attention when Capital City submitted its trial exhibits to Stewart's counsel.   In contrast to the taxes paid, an obligation of which she was aware, the debtor was in the dark regarding the amount of any attorney's fees and related expenses that Capital City might charge.   Accordingly, any allowed attorney's fees and related expenses should bear

64

interest only from the filing of the proof of claim or the exchange of exhibits, as the case may be.

As noted above, the renegotiated terms in 1996 sought on Stewart's part to avoid the predatory feature of Note rate interest on attorney's fees.  That interest on attorney's fees was not provided for in the new Note and the intent of the parties was to reform the predatory nature of the loan.  The court will thus disallow interest on attorney's fees at the Note rate.[37]  Furthermore, in preparing the revised ledger, Capital City will not be allowed to apply Stewart's payments to any allowed attorney's fees or other expenses prior to applying the payments to monthly payments that have come due (treating the note as de-accelerated), as the debtor has been making monthly payments of principal and interest awaiting the outcome of this litigation, with the issue of the appropriate amount of fees and expenses subject to review.

V

FEDERAL RULE OF BANKRUPTCY PROCEDURE 7068

Capital City made an offer of judgement under Rule 7068 that, as of December 31, 2002, the amount of the Note was not

---

[37] Capital City was undergoing difficulties in this period with investigations from governmental agencies, and private as well as public lawsuits with regards to these predatory loans, and thus the motive for reforming the Note to a non-predatory loan can be ascribed to Capital City as well.

less than $27,424.80, with arrears (in excess of the stipulated amount of minimum arrears of $2,370.39) of not less than $2,543.63 and plaintiff's attorney's fees of not more than $750 in enforcing the 1996 Note and Settlement Agreement.[38]  Offers of judgement are not admissible in the court's deliberations.  However, if the amount that is recovered by the offeree is not more favorable than the offer, the offeree (here, Stewart) must pay the costs incurred after the making of the offer.  In this case, if the court determines that the amount in arrears at December 31, 2002, is at least $2543.63, and the amount of the Note is at least $27,424.80, and the attorney's fees incurred by the debtor were no more than $750 for prosecuting her rights under the Agreement, Capital City might be entitled to the payment of costs incurred after February 5, 2003.[39]

    That is, since Capital City made one three-pronged offer of judgment, the court's award need only favor Stewart on one

---

[38]  The offer was made on January 23, 2003 and Stewart had 10 days after service of the offer to accept.  Thus, the rejection of the offer, absent a writing specifically stating said rejection, occurs 10 days after service.

[39]  The court says "might be entitled" because it has not examined whether the offer of judgment covered all claims litigated in this matter, and the issue of whether an offer of judgment may be made regarding only part of the claims.

of those prongs to moot the Rule 7068 issue.[40]  The Settlement
Agreement, in paragraph 3, states that "[i]n the event that
any party breaches any of the covenants, undertakings or
warranties of this *Agreement and Release*, any party that is
damaged by the breach will be entitled to damages from the
breaching party, including the amount of any counsel fees and
other litigation expenses incurred in enforcing this *Agreement
and Release*."  The court has not taken evidence on the issue
of the debtor's attorney's fees because it was premature to do
so prior to the conclusion of the trial on the other issues.
One breach of the Agreement and Release may have been Capital
City's failure to acknowledge that the old Deed of Trust was
no longer enforceable.  At trial, Capital City attempted to
argue that there was a default based on failure to pay taxes
and insurance.  Pressing that argument may have violated the
provision of the Settlement Agreement and Release that to
enforce a default Capital City had to give 15 days notice to
the debtor and Ms. Docter.

     Due to the number of charges this court has disallowed
and the instructions that this court will give in the order to

---

     [40]  The court notes that Ms. Docter, the debtor's
attorney, bills at $300 per hour and would therefore only have
to spend 2 hours and 20 minutes on this matter to moot the
Rule 7068 issue.

ensure that Capital City is administering the loan in accordance with the documents, this court will reserve judgment on the Rule 7068 issue until after Capital City has submitted the corrected documentation, called for in this decision and the contemporaneous order, to this court.

An order follows.

Copies to:

Charles Acker, III
1223 11th St., N.W.
Washington, DC 20001

Leticia M. Watson
1223 11th St. NW
Washington, DC 20001

Marcia K. Docter
DOCTER, DOCTER & LYNN, P.C.
666 11th St., NW
Suite 1010
Washington, DC 20001